UNITED STATES *ex rel.* BOYNTON *v.* BLAINE.

ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 1149.   Argued March 5, 6, 1891. — Decided March 23, 1891.

The writ of mandamus cannot issue in a case where its effect is to direct or control the head of an executive department in the discharge of an executive duty, involving the exercise of judgment or discretion.

When a mere ministerial duty is imposed upon the executive officers of the government, that is, a service which they are bound to perform without further question, then, if they refuse, the mandamus may be issued to compel them.

A writ of mandamus confers no new authority, and the party to be coerced must have the power to perform the act.

The act of June 18, 1878, 20 Stat. 124, c. 262, subjects specifically the payment of the Weil and La Abra awards under the Mexican Claims Commission of July 4, 1868, 15 Stat. 679, to the control of the President; and the subject being thus confided to his judgment and discretion, mandamus will not lie to compel their payment.

*Frelinghuysen* v. *Key,* 110 U. S. 63, affirmed and applied.

SYLVANUS C. BOYNTON filed his petition in the Supreme Court of the District of Columbia, November 23, 1889, against the Secretary of State, for a mandamus to compel him to pay the petitioner, as assignee of one Weil, certain moneys in respect of a claim allowed under the convention between the United States and Mexico for the adjudication of claims of citizens of either country upon the government of the other, of July 4, 1868, (15 Stat. 679.) The petition set forth from Art. II of the treaty this clause: "The President of the United States of America and the President of the Mexican Republic hereby solemnly and sincerely engage to consider the decision of the commissioners conjointly or of the umpire, as the case may be, as absolutely final and conclusive upon each claim decided upon by them or him respectively, and to give full effect to such decisions without any objection, evasion, or delay whatsoever;" and also Art. V, as follows: "The high contracting parties agree to consider the result of the proceedings of this commission as a full, perfect and final settlement of every claim upon either government arising out of any transaction of a date prior to the exchange of the ratifications of the present convention; and further engage that every such claim, whether or not the same may have been presented to the notice of, made, preferred or laid before the said commission, shall, from and after the conclusion of the proceedings of the said commission, be considered and treated as finally settled, barred and thenceforth inadmissible."

The petition averred that it was stipulated that if the aggregate of claims allowed on one side exceeded the aggregate of those allowed on the other, the balance should be paid by the government against whom it so resulted in equal annual instalments, and that "the government so receiving such bal-

ance undertook to make distribution and payment *pro rata* to the claimants in whose favor awards had been made."

The petition then stated the sum total of the awards; the balance to be paid over by Mexico to the United States; the payments made by Mexico; the final instalment still remaining due; and an amount remaining undistributed in the State Department paid by Mexico on awards as to the claims of Benjamin Weil and La Abra Silver Mining Company. It was further alleged that the commissioners failed to agree as to the claim of Benjamin Weil, which was referred to an umpire, who heard the case on the proofs submitted and made an award in favor of Weil, which, "together with all the other findings and proceedings of the commission," was duly reported to and filed in the State Department, and thereupon the said award became final and conclusive under the clause of the treaty hereinbefore recited. Petitioner further averred that on November 5, 1875, a part of the award made in favor of Weil was assigned to him by an instrument in writing, which, soon after its execution, was filed in the State Department, where it still remained; and that the Secretary of State paid to petitioner, on August 16, 1880, and March 8, 1881, certain sums applicable to the award in favor of Weil, leaving a balance due.

The petition then showed that on the 13th of July, 1882, on a complaint by Mexico that the award in favor of Weil was made on a false and fraudulent claim, a convention was negotiated and signed with that government, which recited that the President, after considering the circumstances of the case, and in view of the statute of June 18, 1878, being of opinion that the cases of Weil and La Abra Company should be reopened and retried, had concluded the convention with the President of Mexico for that purpose, which convention was, on the 26th day of July, 1882, submitted by the President in a special message to the Senate of the United States for its constitutional assent and concurrence; and that, while it was pending in the Senate, one Key, an assignee of a portion of the award in favor of Weil, instituted a proceeding in the Supreme Court of the District of Columbia for a writ of man-

damus on the Secretary of State, and a peremptory writ was granted, but the Secretary of State appealed to the Supreme Court of the United States, which pronounced its decision January 7, 1884, reversing the judgment of the court below and denying the mandamus, "as will appear by reference to the case of *Frelinghuysen, Secretary of State,* v. *Key,* reported vol. 110 U. S. Reports, page 63."

The petitioner then gave his view of the decision of the Supreme Court of the United States, and said that the Senate of the United States had notice of it and of the grounds and reasoning on which the court reached its conclusions, but after due consideration and full deliberation, on April 21, 1886, "refused to assent to and concur in the said convention of July 13, 1882, less than two-thirds of the Senators present voting in favor thereof, and a quorum of the Senators being present;" and he contended that this made it certain that the Senate "held that there was no sufficient ground, reason or cause for excepting the said award made in favor of the said Weil from the operation of the finality clause of the treaty of July 4th, 1868. or for repealing or rendering that clause inoperative as to the said award." But petitioner said that nevertheless the Secretary of State refused to make distribution and payment to the said Weil and his representatives or assigns "of their distributive shares of the moneys now lying in the State Department, and due to him or them as aforesaid;" and on November 20, 1889, in response to a written demand therefor, replied "that for causes deemed lawful and sufficient" he was unable to comply therewith. Finally, petitioner averred that the moneys paid into the Department of State in respect of the Weil award were so paid in trust to distribute and pay the same to Weil or his representatives or assigns in satisfaction of his original claim against Mexico.

Petitioner thereupon prayed for process and that a peremptory writ of mandamus be granted upon hearing.

A rule to show cause having been entered, the Secretary of State answered, stating, among other things, the amount that would be paid to relator "if the President of the United States, in whose control is the said undistributed balance, should de-

termine that it is not inconsistent with the public interests to pay the same, or so much thereof as would be ratably payable to the said Boynton," but saying, "that the President of the United States has forbidden the payment of any part of the said net balance on the ground hereinafter stated, and that for that reason no scheme of distribution of the said net balance has been made." The answer then alleged that the money paid by Mexico became, upon receipt, the money of the United States, and not in any way subject to the demand or control of the original claimants, who were not recognized by the said commission, the only parties to which, and who appeared before the commission, being the governments of the United States and the Republic of Mexico, each represented by one person, in virtue of Article II of the treaty.

It was further stated that the allegation of the petition that the United States was under some obligation "to make distribution and payment *pro rata* to the claimants in whose favor awards had been made" was not founded on any provision of the said treaty. And further, that the United States was "invested with the entire control of said claims to enable it to discharge any international duty that may attach thereto or to any part thereof, and that if the President of the United States has probable cause to think that good faith towards the Republic of Mexico and a proper regard for the honor of the United States require that any part of the money so paid by the Republic of Mexico should be withheld from distribution, this respondent is advised that it is the duty of the President to withhold payment of the same until a proper investigation can be had; and this respondent, answering, saith, that so it is that grave charges and representations impeaching the integrity of the evidence on which the award in the case of said Weil was made have been brought to the notice of the Government of the United States in a way to command its earnest attention; and that it is the desire of the President to have the said charges and representations investigated so soon as the Congress shall have provided the means for doing so."

The answer also averred that a bill had been reported to the Senate on June 20, 1888, "to provide for the desired in-

vestigation by investing the Supreme Court of the District of Columbia with jurisdiction over the subject;" that "while the said charges and representations are pending the President of the United States hath concluded that payment of the money now demanded by the relator should be withheld;" and that the course thus taken by the President was in harmony with section 5 of the act of June 18, 1878.

The inference set up in the petition as deducible from the rejection by the Senate of the convention of July 13, 1882, was denied, and the contrary inference suggested, in view of the bill reported in the Senate, that "the refusal of the Senate to ratify the said convention was the result of a desire that the proposed investigation into the said charges and representations should be made by a tribunal deriving jurisdiction over the subject from a law of the United States."

It was then averred that the money awarded was not held by respondent impressed with a trust for the parties claiming to be entitled to the same, but as the agent of the President, whose control over it was complete, and who could at any time withdraw it from the control of the respondent; that to hold him accountable as a trustee might be to subject him to personal liability for the money; and that it would cause an embarrassing conflict to adjudge him responsible to private parties for a fund which it might be the duty of the United States to return to the Republic of Mexico, as decided in the case of *Frelinghuysen* v. *Key*, referred to by relator. The answer finally alleged that the petition related to a matter "which falls exclusively within the powers and competency of the President of the United States and this respondent as subordinate to him and subject to his direction and control, and which doth in nowise fall within the jurisdiction and competency of the judicial department of the government of the United States; and that it would involve an interference by the said judicial department with a matter which is exclusively committed by the Constitution to its coördinate, the executive department, for this honorable court to take cognizance of the matter of the relator's petition."

The cause having been heard, the mandamus was refused

and the petition dismissed, whereupon a writ of error was allowed to this court.

The following may be taken as a sufficiently comprehensive statement of the matters upon which the judgment proceeded.

The time for decision fixed by the convention of July 4, 1868, was from time to time extended, finally until November 20, 1876, and payment of the first instalment to the government in favor of whose citizens the greater amount might have been awarded, was provided to be made on or before January 31, 1877. (19 Stat. 642.)

On the 19th of January, 1877, Mr. Secretary Fish invited the attention of Congress to the necessity of making provision for carrying the awards into effect, and pointed out that "an appropriation by Congress will be necessary for the payment of the amount of the awards against the United States, which sum, by the terms of the treaty, is to be deducted from the awards against Mexico and from the amount to be paid by Mexico. Provisions should also be made for the distribution among the several parties entitled to the money as it may be received, and also for the reimbursement to the United States of the amount paid by the United States toward the joint expenses of the commission, and which, by the terms of the treaty, is to be deducted from the awards." A bill to carry out the Secretary's recommendation passed the House during the Forty-fourth Congress, and was favorably reported in the Senate, but was recommitted to enable the committee to consider the complaints made by the Mexican government as to the manner in which the awards in favor of La Abra Company and Weil were procured. The Mexican government had, in the meantime, notified the Secretary of State of the existence of evidence, not within its possession before the awards were rendered, which, it was claimed, would establish the fact that the awards in the cases of La Abra Company and Benjamin Weil were procured by fraudulent imposition upon the commission and upon the government of the United States on the part of the claimants. The finality of the awards as between the two governments was not denied by Mexico, and the Mexican minister announced the intention

of the government to comply with the treaty by paying the instalments as they became due. At the next session a bill passed both Houses, entitled: "An act to provide for the distribution of the awards made under the convention between the United States of America and the Republic of Mexico, concluded on the fourth day of July, eighteen hundred and sixty-eight," which was approved June 18, 1878. 20 Stat. 144, c. 262. Sections 1 and 5 of this act are as follows:

"That the Secretary of State be, and he is hereby, authorized and required to receive any and all moneys which may be paid by the Mexican Republic under and in pursuance of the conventions between the United States and the Mexican Republic for the adjustment of claims, concluded July fourth, eighteen hundred and sixty-eight, and April twenty-ninth, eighteen hundred and seventy-six; and whenever, and as often as, any instalments shall have been paid by the Mexican Republic on account of said awards, to distribute the moneys so received in ratable proportions among the corporations, companies or private individuals respectively in whose favor awards have been made by said commissioners, or by the umpires, or to their legal representatives or assigns, except as in this act otherwise limited or provided, according to the proportion which their respective awards shall bear to the whole amount of such moneys then held by him, and to pay the same, without other charge or deduction than is hereinafter provided, to the parties respectively entitled thereto. And in making such distribution and payment, due regard shall be had to the value at the time of such distribution of the respective currencies in which the said awards are made payable; and the proportionate amount of any award of which by its terms the United States is entitled to retain a part shall be deducted from the payment to be made on such award, and shall be paid into the Treasury of the United States as a part of the unappropriated money in the Treasury."

"SEC. 5. And whereas the government of Mexico has called the attention of the government of the United States to the claims hereinafter named with a view to a rehearing, therefore be it enacted, that the President of the United [States] be and

he is hereby requested to investigate any charges of fraud presented by the Mexican government as to the cases hereinafter named, and if he shall be of the opinion that the honor of the United States, the principles of public law or considerations of justice and equity, require that the awards in the cases of Benjamin Weil and La Abra Silver Mining Company, or either of them, should be opened and the cases retried, it shall be lawful for him to withhold payment of said awards, or either of them until such case or cases shall be retried and decided in such manner as the governments of the United States and Mexico may agree, or until Congress shall otherwise direct. And in case of such retrial and decision, any moneys paid or to be paid by the Republic of Mexico in respect of said awards respectively, shall be held to abide the event, and shall be disposed of accordingly; and the said present awards shall be set aside, modified or affirmed as may be determined on such retrial: *Provided*, That nothing herein shall be construed as an expression of any opinion of Congress in respect to the character of said claims, or either of them."

Under the provisions of the fifth section, President ' Hayes caused the charges of fraud, preferred by the Mexican government, to be investigated, and Mr. Evarts, then Secretary of State, made a careful examination of the supplemental evidence presented by Mexico, and submitted his conclusions to the President in August, 1879, which were in substance: That neither the principles of public law nor considerations of justice and equity required or permitted as between the United States and Mexico that the awards should be opened and the cases retried before a new international tribunal, or under any new convention or negotiation respecting the same; that, however, the matters called to the attention of the government on the part of Mexico brought into grave doubt the substantial integrity of the claim of Benjamin Weil, and the sincerity of the evidence as to the measure of damages insisted upon and accorded in the case of La Abra Silver Mining Company; that the honor of the United States required that these two cases should be further investigated by the United States to ascertain whether this government had been made the

means of enforcing against a friendly power claims of our citizens based upon or exaggerated by fraud; that if further investigation should remove the doubts, the honor of the United States would have been completely maintained, but if, on the other hand, the claimants should fail in removing these doubts, or they should be replaced by certain condemnation, the honor of the United States would be vindicated by such measures as might then be dictated; and that, as the executive had not the means of instituting and pursuing methods of investigation which could coerce the production of evidence or compel the examination of parties and witnesses, and the authority for such an investigation must proceed from Congress, the proofs and conclusions the President might come to thereon, if adverse to the immediate payment on these awards of the instalments received from Mexico, " should be laid before Congress for the exercise of their plenary authority in the matter." These views were adopted by President Hayes, and on the 15th of April, 1880, were communicated to Congress with another report of Mr. Secretary Evarts, under date of April 13, 1880, recapitulating his report of the preceding August, and concluding: " Unless Congress should now make this disposition of the matter, and furnish thereby definite instructions to the department to reserve further payments upon these awards till the conclusion of such investigation, and to take such further order with the same thereafter as Congress might direct, it would appear to be the duty of the executive to accept these awards as no longer open to reconsideration, and to proceed in the payment of the same *pro rata* with all other awards under the convention." On April 27, 1880, a bill was introduced in the Senate directing the Court of Claims to investigate the claims in question, and was referred to the Committee on the Judiciary, which reported adversely, and in effect that the proper remedy was in a new convention, in which provision should be made for doing justice to all claimants. On a bill of like character the House Committee on Foreign Affairs made a favorable report.

In August, 1880, Mr. Secretary Evarts, having been notified through the Mexican legation of the intention of the Mexican

government to commence suits to impeach and set aside the two awards, objected to such proceeding as in contradiction of the whole purpose of the convention, as well as of explicit provisions thereof; and accordingly no further steps were taken in that direction.

No definitive instructions were given by Congress in respect to the matter during that session, but after its close payments were made upon these awards by the direction of the President, the same as on the others. Another instalment was paid by the Mexican government and distributed to these claimants, with the rest, during President Garfield's administration. In this way five instalments were distributed. After President Arthur came into office he examined the cases further, and, "believing that said award was obtained by fraud and perjury," negotiated a treaty with Mexico, providing for a rehearing. On January 31, 1882, the sixth instalment was paid by Mexico to Mr. Frelinghuysen, then Secretary of State, but a distribution of this instalment to these claimants was withheld by order of the President.

The cases of *Frelinghuysen* v. *Key* and *La Abra Silver Mining Company* v. *Frelinghuysen*, 110 U. S. 63, were decided by this court January 7, 1884. President Arthur negotiated the convention with Mexico for a rehearing of the cases by a joint commission, July 13, 1882, and sent it to the Senate for its consideration. This convention was rejected by the Senate, April 21, 1886. On May 11, 1886, President Cleveland transmitted to Congress a report of the then Secretary of State, dated May 6, in respect to the claims in question. Mr. Bayard in his communication gave a resumé of the various proceedings touching the claims, and suggested that the President "notify Congress of the condition of the law and facts." He said: "It is within the province of the legislative branch of this government now to review the history of the proceedings — legislative, executive and judicial — connected with the two claims;" and, referring to the act of June 18, 1878, thus concluded: "This last-mentioned act of Congress contained the further provision — stated not additionally, but in the alternative to those above recited — 'or until Congress

shall otherwise direct.' To relieve the action of our government from any ambiguity of legislative expression, or the executive from any uncertainty as to his line of duty in relation to the awards in favor of Benjamin Weil and La Abra Silver Mining Company, under the treaty with Mexico, promulgated February, 1869, I suggest that the attention of Congress should be earnestly invoked to the consideration of the present status of these claims referred to, and the duty of the executive under an existing treaty, to which the force and effect of paramount law is given by the Constitution, in the event of the adjournment of the two Houses without further action in reference thereto."

March 5, 1888, President Cleveland in a special message transmitted a recommendation from the Secretary of State that " Congress take action to provide expressly for the reference of the claims in question to the Court of Claims or such other court as may be deemed proper, in order that a competent investigation of the charges of fraud may be made." The Secretary's communication referred to *Frelinghuysen* v. *Key*, and enclosed a letter from the chairman of the Senate Committee on Foreign Relations, dated March 5, 1887, containing a resolution embodying the views of a majority of that committee, and requesting the President to withhold further payments on the awards in question until the allegations of fraud " shall have been duly investigated by the courts of the United States, under the direction of the President, or under the further direction of Congress," and letters from members of the House of Representatives upon the same subject, dated March 5 and 7, 1887. The Secretary stated that it was thought that a proper judicial investigation of the claims in question might be secured under the twelfth section of the act approved March 3, 1887, entitled " An act to provide for the bringing of suits against the government of the United States," and that the department had sought the consent of the claimants in the Weil and La Abra cases to an investigation and decision of the allegations of fraud in relation thereto, by the Court of Claims, which was declined. The President's message closed with these words : " If for any reason this proceeding be con-

sidered inadvisable, I respectfully ask that some final and defi-
nite action be taken, directing the executive department of
the government·what course to pursue in the premises.    In
view of the long delay that has already occurred in these
cases, it would seem but just to all parties concerned that the
Congress should speedily signify its final judgment upon the
awards referred to, and make the direction contemplated by
the act of 1878, in default of which the money now on hand
applicable to such awards remains undistributed."

New bills were introduced, providing for a judicial investi-
gation of the charges of fraud in connection with these claims,
and on June 20, 1888, the Senate Committee on Foreign Re-
lations made a report recommending the passage of a bill for
that purpose, in the Weil case.    An inquiry was subsequently
ordered by the Senate with reference to the La Abra claim,
which commenced September 24, 1888, and extended to Feb-
ruary 27, 1889, and was reported upon March 1, 1889.    The
petition in this case was filed November 23, 1889.

*Mr. George Ticknor Curtis* and *Mr. A. H. Garland* (with
whom was *Mr. H. J. May* on the brief) for plaintiff in error.

I. The award made against Mexico in favor of ·Benjamin
Weil remains a final and conclusive adjudication in favor of a
citizen of the United States against a foreign government.

II. The United States have not now and never have had any
property, right or interest in the original claim or the award,
or in money paid in by Mexico to meet and satisfy it.

III. The money so paid is by the terms of a statute in the
official custody of the Secretary of State.    The President of
the United States has now no lawful control over it, and
never had any lawful control over it, excepting for a tempo-
rary purpose during the pendency of a new treaty in the Sen-
ate.    That control ended when the· Senate rejected the new
treaty.

IV. Congress has no constitutional power to pass the bill
now pending in the Senate, which undertakes to confer on a
municipal court of the United States jurisdiction to set aside

the awards in question in a suit or suits instituted in the name of the United States to retry the original claims. This point is taken in case the court should think it necessary to look at the proposed senate bill.

*Mr. Assistant Attorney General Maury* for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The writ of mandamus cannot issue in a case where its effect is to direct or control the head of an executive department in the discharge of an executive duty involving the exercise of judgment or discretion. *United States ex rel. Redfield* v. *Windom,* 137 U. S. 636, 644. When by special statute, or otherwise, a mere ministerial duty is imposed upon the executive officers of the government; that is, a service which they are bound to perform without further question, then if they refuse, the mandamus may be issued to compel them. *United States ex rel. Dunlap* v. *Black,* 128 U. S. 40, 48. The writ goes to compel a party to do that which it is his duty to do without it. It confers no new authority, and the party to be coerced must have the power to perform the act. *Brownsville* v. *Loague,* 129 U. S. 493, 501.

In view of these settled principles was the relator entitled to the writ?

Upon establishing at the seat of government an executive department to be known as the Department of State, with a Secretary of State as its head, Congress provided:

"The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted to him by the President relative to correspondences, commissions or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs as the President of the

United States shall assign to the Department, ·and he shall conduct the business of the Department in such manner as the President shall direct." Rev. Stat. §§ 199, 202; 1 Stat. pp. 28, 68.

It is contended, however, that, in this instance, the final custody of the money was vested by the act of June 18, 1878, solely in the Secretary of State, and that it was thereby made his duty to distribute and pay the awards to the claimants independently of the direction or control of the President. But the act thus referred to as the basis of this application, when considered throughout as it must be, not only does not undertake to impose the payment of these awards as an independent duty upon the Secretary, but specifically subjects such payment to the control of the President. The Secretary of State was, indeed, authorized and required by the first section to receive from Mexico the whole money awarded, and to distribute the same from time to time as the instalments came in, among those in whose favor awards had been made, or to their legal representatives or assigns, but this was accompanied by the restriction, explicitly expressed, out of abundant caution, "except as in this act otherwise limited or provided." And by section five, the payment and distribution were limited, so far as the cases of Weil and La Abra Company were concerned, by the request to the President to investigate any charges of fraud as to those claims, and the provision that if he should be. of the opinion "that the honor of the United States, the principles of public law or considerations of justice and equity," required that the awards, thus specifically named, or either of them, should·be reopened, and the cases retried, it should be lawful for him "to withhold payment of said awards, or either of them, until such case or cases shall be retried and decided in such manner as the governments of the United States and Mexico may agree, or until Congress shall otherwise direct."

Payment of the Weil award had been withheld by the President, after an investigation, but the case had not been retried and decided in a manner agreed upon by the United States and Mexico, nor had Congress otherwise directed. How

then could Weil or his assignee, the relator, insist upon payment under the first section of the act in disregard of the limitation imposed by the fifth? On what principle could it be held that the duty was imposed upon the Secretary to pay an award by an act expressly providing that payment should not be made in a specified contingency, which had occurred? What power had he to do the thing demanded in virtue of legislation which forbade it to be done?

The political trust with which every government is charged, as respects its own citizens, was not the ground of relator's contention, but he relied on the act of 1878 as giving him the right to enforce the alleged obligation by judicial proceedings, and it was essential to the maintenance of his position that the record should bring him within its terms.

The principal propositions urged by counsel are, that "the award made against Mexico in favor of Benjamin Weil remains a final and conclusive adjudication in favor of a citizen of the United States against a foreign government;" that "the United States have not now and never have had any property, right or interest in the original claim or the award, or in the money paid in by Mexico to meet and satisfy it;" that "the money so paid is, by the terms of a statute, in the official custody of the Secretary of State; the President of the United States has now no lawful control over it, and never had any lawful control over it, excepting for a temporary purpose during the pendency of a new treaty in the Senate; that control ended when the Senate rejected the new treaty."

These propositions have already been substantially disposed of by the decision of this court in *Frelinghuysen* v. *Key*, 110 U. S. 63, from the principles announced in which we have no disposition to recede. It was there ruled, Mr. Chief Justice Waite delivering the opinion, that there was no doubt as to the conclusiveness of the awards under the convention of July 4, 1868, but that the language of the treaty was to be construed as used in a compact between two nations for the adjustment of the claims of the citizens of either against the other; that citizens of the United States having claims against Mexico were not parties to the convention; that while the

claims of individual citizens were to be considered by the commission in determining amounts, the whole purpose of the convention was to ascertain how much was due from one government to the other on account of the demands of their respective citizens; that, as between the United States and Mexico, the awards were final and conclusive until set aside by agreement between the two governments or otherwise; that the right of the United States to treat with Mexico for a retrial was unquestionable; that each government, when it entered into the compact under which the awards were made, relied on the honor and good faith of the other for protection, as far as possible, against frauds and impositions by the individual claimants; and that where a fraudulent claim or false testimony was presented by a citizen for reference to the commission, this was an imposition on his own government, and it would be not only its right but its duty to repudiate the act, if it afterward discovered that it had in this way been made an instrument of wrong towards a friendly power. And the Chief Justice said: "International arbitration must always proceed on the highest principles of national honor and integrity. Claims presented and evidence submitted to such a tribunal must necessarily bear the impress of the entire good faith of the government from which they come, and it is not to be presumed that any government will for a moment allow itself knowingly to be made the instrument of wrong in any such proceeding. No technical rules of pleading as applied in municipal courts ought ever to be allowed to stand in the way of the national power to do what is right under all the circumstances. Every citizen who asks the intervention of his own government against another for the redress of his personal grievances must necessarily subject himself and his claim to these requirements of international comity." And considering the act of June 18, 1878, in its operation upon the question of further negotiations, it was remarked that no disposition was manifested "on the part of Congress to encroach on the power of the President and Senate to conclude another treaty with Mexico in respect to any or even all the claims allowed by the commission, if in their opinion the honor of the United

States should demand it. At most, it only provides for receiving and distributing the sums paid without a protest or reservation, such as, in the opinion of the President, is entitled to further consideration. It does not undertake to set any new limits on the powers of the Executive." As to the fifth section of that act, it was observed: "From the beginning to the end, it is, in form even, only a request from Congress to the Executive. This is far from making the President for the time being a *quasi* judicial tribunal to hear Mexico and the implicated claimants and determine once for all as between them, whether the charges which Mexico makes have been judicially established."

And it was added that, " as between the United States and the claimants, the honesty of the claims is always open to inquiry for the purposes of fair dealing with the government against which, through the United States, a claim has been made."

The new convention was then pending in the Senate, and it was clear that the discretion of the executive department of the government to withhold all further payments to the relators until the diplomatic negotiations between the two governments on the subject were finally concluded, could not be controlled by the judiciary.

This is conceded by the relator, and such a concession is inconsistent with the contention that the award was a final and conclusive adjudication in Weil's favor, as an individual, against Mexico. As between nations, the proprietary right in respect to those things belonging to private individuals or bodies corporate within a nation's territorial limits is absolute, and the rights of Weil cannot be regarded as distinct from those of his government. The government assumed the responsibility of presenting his claim, and made it its own in seeking redress in respect to it. Under this convention it was the balance that was to be paid, after deducting from what was found in favor of one government that which was found in favor of the other. So that the moneys paid in liquidation of that balance belonged to the United States, to be increased by appropriation to the extent of the amounts allowed Mexico,

and the aggregate to be distributed to the claimants as might be provided.

In *United States ex rel. Angarica* v. *Bayard*, 127 U. S. 251, 259; where a sum of money had been received by the Secretary of State as part of an award made by the Spanish-American Claims Commission, which sum of money had been eventually paid to the petitioner, but had in the meantime been invested and earned interest, it was held that the Secretary was not liable to pay such interest to the petitioner, because the sum in question was withheld by the United States and the petitioner's claim based on the withholding was a claim against the United States, and the case fell within the settled principle that interest is not allowed on claims against the United States, unless the government has stipulated to pay interest or it is given by express statutory provision. There, under the agreement for arbitration, as here, under the convention, the claim was laid before the arbitrators and umpire "on the part of the government of the United States," and was presented with the testimony in its favor " only through the government of the United States," and "by the government of the United States." So the two advocates were spoken of as "representing respectively the two governments," and it was stated that "the two governments will accept the awards." "Thus by the plain terms of the agreement," remarked Mr. Justice Blatchford, delivering the opinion of the court, "the amount of the award in the case of Angarica was to be paid by the Spanish government to the government of the United States. It was paid by the Spanish government to the Secretary of State of the United States, representing the government of the United States. If there was any unlawful withholding from the petitioner of the $41,129.74, the money was withheld by the government of the United States, acting through the Secretary of State, and any claim of the petitioner, based upon an unlawful withholding, was a claim against the government of the United States."

Congress in furnishing the auxiliary legislation needed to carry the results of the convention under consideration into effect, requested the President to so far investigate certain

charges of fraud as to determine whether a retrial ought to be had. This inquiry might have resulted in reopening the awards as between the two nations, or in such reëxamination in a domestic forum as would demonstrate whether the honor of the United States required a different disposition of the particular amounts in question. The validity and conclusiveness of the awards remained unimpugned so long as they were permitted to stand, and the principle of *res adjudicata* could not be invoked against the United States by individual claimants while the controversy raised as to them remained *in fieri.*

In *Frelinghuysen* v. *Key*, while conceding the essential value of international arbitration to be dependent upon the certainty and finality of the decision, the court adjudged that this government need not therefore close its doors against an investigation into the question whether its influence had been lent in favor of a fraudulent claim. It was held that no applicable rule was so rigid as not to be sufficiently flexible to do justice, and that the extent and character of any obligation to individuals, growing out of a treaty, an award and the receipt of money thereon, were necessarily subject to such modification as circumstances might require.

So long as the political branch of the government had not lost its control over the subject matter by final action, the claimant was not in a position, as between himself and his government, to insist on the conclusiveness of the award as to him. And while it is true that for the disposition of the case of *Frelinghuysen* v. *Key* it was sufficient that it appeared that diplomatic negotiations were pending- which, as the court demonstrated, the act of 1878 in no manner circumscribed, it does not follow that the political department of the government lost its control because those negotiations failed.

On the contrary, that control was expressly reserved, for it was made the duty of the President, if of opinion that the cases named should be retried, to withhold payment until such retrial could be had in an international tribunal, if the two governments so agreed, or in a domestic tribunal if Congress so directed, and, at all events, until Congress should

otherwise direct. The fact that a difference of view as to whether the retrial should be international or domestic may have arisen and led to delay, or that such difference may have existed on the merits, does not affect the conclusion. The inaction of Congress is not equivalent to a direction by Congress. The political department has not parted with its power over the matter, and the intervention of the judicial department cannot now be invoked.

The judgment of the Supreme Court of the District is

*Affirmed.*