---

(No. 11879.—Judgment affirmed.)
THE PEOPLE *ex rel.* L. F. Brown, Appellant, *vs.* FRANK O. LOWDEN *et al.* Appellees.

*Opinion filed December 18, 1918.*

1. CONSTITUTIONAL LAW—*legislature may require vouchers to be itemized and approved before payment by Auditor.* It is within the power of the legislature to require that vouchers or claims be itemized and that they be approved by some official as a condition of their presentation to the Auditor of Public Accounts for payment, and such a requirement in no way infringes the powers or privileges of the Auditor.

2. FEES AND SALARIES—*law requires a voucher for pay of live stock commissioner to be itemized.* Under section 12 of the act of 1909, relating to the board of live stock commissioners, the mere fact that a member of such board has been necessarily em-

ployed a certain number of days in the discharge of his duties does not entitle him to be paid by the Auditor of Public Accounts unless he also presents to the Auditor a certified and itemized voucher approved by the Governor.

3. SAME—*when voucher for services is not sufficiently itemized.* A voucher for the pay of a member of the board of live stock commissioners, reciting that it is for "twenty-four (24) days necessarily employed in the discharge of the duties of his office at the rate of $10 per day, $240," is not an itemized voucher such as is meant by section 12 of the act of 1909, relating to such board, and it is the duty of the Governor, under such act, to decline to approve such voucher until it is properly itemized.

FARMER, J., DUNCAN, C. J., and COOKE, J., dissenting.

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

VROMAN, MUNRO & VROMAN, (STEVENS & HERNDON, of counsel,) for appellant.

EDWARD J. BRUNDAGE, Attorney General, and CLARENCE N. BOORD, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The appellant, L. F. Brown, filed in the circuit court of Sangamon county his petition in the name of the People of the State of Illinois against the appellees, Frank O. Lowden, Governor, Andrew Russel, Auditor of Public Accounts, and Len Small, State Treasurer, for a writ of *mandamus* commanding the Governor to approve vouchers submitted to him for salary alleged to be due the relator as a member of the State board of live stock commissioners for the months of February, March, April and May, 1917, and commanding the Auditor to issue warrants for the same and the Treasurer to countersign the warrants and pay them. The defendants demurred to the petition, and the demurrer being sustained, the relator elected to stand by the petition and it was dismissed at his costs.

The facts stated in the petition and admitted by the demurrer are substantially as follows: The relator was appointed a member of the board of live stock commissioners on September 23, 1914, and occupied the office until May 29, 1917. The salary allowed to a member of said board was $10 per day for each day necessarily employed in the discharge of his duties, and the General Assembly made appropriations for the payment of such salaries. There remained in the appropriation an unpaid balance sufficient for all claims for salary of the members of the board. The relator was necessarily employed 24 days during the month of February, 27 days in the month of March, 25 days in the month of April and 27 days in the month of May in the performance of the duties imposed upon him by law. For each of said months a voucher was made in this form:

"SPRINGFIELD, *February 26, 1917.*
"*State of Illinois, State Board of Live Stock Comrs.:*
To L. F. Brown, Commissioner.                                    Dr.
               702-130 N. Fifth ave., Chicago, Illinois.
"To salary as member of the State board of live stock commissioners, for services performed in the month of February, 1917, being twenty-four (24) days necessarily employed in the discharge of the duties of said office at the rate of $10 per day, $240.
"We hereby certify the above account of two hundred and forty dollars ($240) to be correct.
                    STATE BOARD OF LIVE STOCK COMMISSIONERS,
                              L. F. Brown, *Chairman,*
                              J. E. Quinn,
                              R. M. Patterson.
Approved: .............., *Governor.*"

The relator was actually engaged in the performance of his duties as a member of the board on each of the number of days set forth in the vouchers in an endeavor to stamp out a scourge of "foot-and-mouth disease" which prevailed among cattle in this State, and the employment was necessary for the preservation of the cattle and other live stock of the State. The vouchers were presented to the Governor, and were returned on June 12, 1917, with a letter signed

by Joseph C. Mason, Department and Institution Auditor, calling for an itemized statement showing the precise nature of the work claimed to have been performed by the board on each of the days for which salary was claimed. The relator, through his agent and attorney, made a demand upon the Governor for the approval of the vouchers, but the Governor refused to approve them, offering no other explanation or reason than was stated in the letter of June 12. By the refusal of the Governor to approve the vouchers the Auditor and Treasurer were prevented from paying the relator's salary from moneys appropriated by the General Assembly for that purpose. By sustaining the demurrer the circuit court decided that these facts did not entitle the relator to the writ.

The board of live stock commissioners was created under the provisions of an act entitled "An act to revise the law in relation to the suppression and prevention of the spread of contagious and infectious diseases among domestic animals." (Laws of 1909, p. 8.) Section 12 of the act is as follows: "The members of said board shall receive the sum of $10 per day for each day necessarily employed in the discharge of their duties, their necessary traveling expenses and other incidental expenses necessarily incurred in the performance of their duties under this act, to be paid on certified and itemized vouchers to be approved by the Governor."

It was alleged, and the demurrer admitted, that the relator performed services the number of days named in the vouchers in the performance of the duties imposed upon him by the act, but the petition did not allege nor the demurrer admit that any itemized voucher for the time employed in the performance of such services was presented to the Governor for his approval, which was a condition prescribed by section 12 of the act. The meaning of an itemized statement of an account, claim or demand is well understood and is constantly enforced by the courts in requiring bills of par-

ticulars showing the items of a claim or demand. The court defined the meaning of a legislative provision for an itemized statement in the case of *Lovell* v. *Sny Island Levee Drainage District,* 159 Ill. 188, where it was said: "An item is a separate particular of an account, and to itemize is to state in items or by particulars." A like definition is given in Webster's New International Dictionary, that, as related to an account, to itemize is to state in items or by particulars; to set down as an item or by items; and the Standard Dictionary defines "itemize" to mean to set down by items; state or describe by particulars, as to demand an itemized bill. The relator was not entitled to the salary solely on the ground that he had been necessarily employed, but it was a further requirement that he should furnish the Governor with itemized vouchers for approval. That a voucher for services performed during a certain number of days in a certain month is not itemized, under any definition or the common understanding of an itemized claim, account or voucher, is too clear for argument, and it would have been a violation of the express terms of the act under which the relator held office, for the Governor to approve the vouchers submitted which were not itemized.

Whether the law provides for a department and institution auditor or not is of no importance, since the refusal to approve the vouchers was the act of the Governor.

By the act requiring itemized vouchers approved by the Governor as a condition of payment, no right, privilege or duty of the Auditor of Public Accounts was limited, restricted or interfered with in any manner. It was necessarily conceded by the relator in making the Governor a defendant that the provision which made his approval a condition of payment was valid. It is the duty of the Auditor of Public Accounts, under the constitution, to examine and verify accounts and claims and to draw warrants for the same only on appropriations set apart for their payment. It is not beyond the legislative power to require the certifica-

tion or approval of a pay-roll, voucher or claim by some official as a condition of presentation to the Auditor and payment. It has been the constant, universally recognized and unquestioned practice to require approval or certification of pay-rolls, claims and accounts by the heads of departments, divisions and institutions or officials in charge of contracts and certification of pay-rolls by the State civil service commission. Section 2 of the act making the appropriation for salaries of members of the live stock commission provided that the Auditor should draw his warrants upon the Treasurer for the same upon presentation of proper vouchers, which meant the vouchers provided by the act. As the relator did not comply with an essential condition for the payment of his salary there was no duty on the part of the Governor to approve the vouchers and no right of the relator to compel approval.

No question of the power of a court to command the performance of any duty by the Governor is involved in this case. There was no refusal on his part to perform the duty imposed upon him, but only a requirement that the relator should comply with the law.

The court was right in sustaining the demurrer and dismissing the petition, and the judgment is affirmed.

<em>Judgment affirmed.</em>

FARMER, J., DUNCAN, C. J., and COOKE, J., dissenting:

We are unable to agree to the decision of the court in this case. It seems obvious to us that the vouchers filed by relator complied with the requirements of the statute. There was no claim for traveling or other incidental expenses, and no other itemization was required than the number of days employed by relator in the discharge of his duties. The only other itemization that could have been reasonably made would have been to state the particular days in each month relator was employed and the nature and character of the work performed each day. The statement

that relator had been employed a certain number of days in a month in the discharge of his duties is clear, definite and sufficient in our judgment, and as fully meets the requirements of the statute as if the particular days of the month on which the services were rendered had been stated. It surely was not in the contemplation of the statute that the vouchers should state "the precise nature of the work claimed to have been performed," which would necessitate a statement of whether the services were rendered in the investigation of reports of communicable diseases among domestic animals, or in quarantining premises where contagion was found, or removing animals from contact with infected animals, or in slaughtering diseased animals after causing them to be appraised, or disinfecting or destroying barns affected, or other duties imposed by law upon the live stock commissioners. If a commissioner was employed a day in the discharge of any of the duties required of him by law he was entitled to pay, whatever the nature and character of the work performed, and where no traveling expenses or other incidental expenses were claimed no other itemization was required except a statement of the number of days employed. If it was believed the claim was false and that the relator had not been employed the number of days he claimed compensation for, an issue of fact should have been made and tried. The demurrer admitted the material allegations of the petition that the relator was actually engaged in the performance of the duties of his office the number of days set forth in the vouchers filed and presented.

The opinion of the court concedes the demurrer admitted relator had been employed in the discharge of his duties the number of days stated in the vouchers. It seems rather extraordinary to admit that this is so and deny him the compensation the law provides shall be paid him because it was not stated in the vouchers the particular days in the month the services were rendered or the particular charac-

ter of the services.   If we are correct, it would necessarily
follow that the circuit court erred in denying the peremptory
writ of *mandamus*, unless, as contended by appellees, the
court had no jurisdiction to award the writ against the
Governor.   We do not agree that the court had no juris-
diction to issue the writ to compel the performance of min-
isterial duties, and deem it proper to discuss our reasons
for the view we entertain.

The jurisdiction of courts to issue writs of *mandamus*
against the State Auditor of Public Accounts and the State
Treasurer is not questioned, but it is contended by appel-
lees that courts have no jurisdiction to issue writs of *man-
damus* against the Governor.   A writ is asked against the
Governor commanding him to approve the vouchers pre-
sented to him by appellant,—a duty imposed upon him by
the statute.   It is a purely ministerial act.   Where the
services have been performed, as it is admitted here they
have been, the officer is entitled to the compensation pro-
vided by law and the Governor has no discretion to deter-
mine whether it shall be paid or not.   The right of the
officer to the compensation for services rendered is given
by the law and is not left to the discretion of the Governor.

The question whether courts have jurisdiction to enforce
the performance of any duty by the Governor of the State
has been the frequent subject of consideration and deci-
sion by courts of last resort in many of the States of the
Union, and in most of them, including this State, (*People*
v. *Bissell,* 19 Ill. 229; *People* v. *Yates,* 40 id. 126; *Peo-
ple* v. *Palmer,* 64 id. 41; *People* v. *Cullom,* 100 id. 472;
*People* v. *Dunne,* 258 id. 441;) it has been held the courts
cannot compel or direct the Governor in the performance
of any duty.   Cases so holding are not all based upon the
same ground.   A majority of them are based on the ground
that the three departments of government,—executive, legis-
lative and judicial,—are separate and independent depart-
ments, and that officers charged with the exercise of powers

285 — 40

belonging to one department cannot in any manner control the exercise of powers and functions belonging or appertaining to another department. There is no conflict of authority upon the independence of the Governor of judicial control in the discharge of executive or political duties of the office. These involve the exercise of discretion, and it is universally held that as to such duties the executive is not subject to control or direction by writ of *mandamus*. In several States, not substantially less in number than those holding to the contrary, it is held that where the legislature has by statute imposed ministerial duties on the Governor in the discharge of which he has no discretion, he is subject to control the same as any other executive officer charged with the performance of ministerial duties. Some of the courts holding the Governor is not subject to judicial process in the discharge of any duty apply the same rule to all the executive officers of the State government, but a majority of them hold the rule applies only to the Governor. In some of the cases the controlling factor appears to have been the power of the court to enforce its judgment or decree. Referring to some of the decisions holding the writ cannot issue against an executive officer in any case in which the power of the court to enforce its judgment appears to have been the controlling factor, the court said in *State* v. *Brooks,* 14 Wyo. 393: "The jurisdiction of a court does not depend upon its physical ability to enforce its judgments." And in *Traynor* v. *Beckham,* 116 Ky. 13, it was said: "A court should not anticipate that the Governor will not obey its judgment. If there is a well grounded fear that a Governor would resist the enforcement of the judgment, that should not excuse the court for a failure to perform its duty by adjudging to an individual the rights which the law of the land vouchsafed to him."

This court has in repeated decisions, some of them very recent, been committed to the rule that executive State offi-

cers other than the Governor are subject to the writ of
*mandamus* in the. discharge of their ministerial .duties.   In
this State *People* v. *Bissell, supra,* has been followed in
subsequent decisions.   That case recognized no distinction
between the constitutional duties of the Governor of an ex-
ecutive or political character involving the exercise of dis-
cretion, and ministerial duties imposed by statute, the exer-
cise of which admits of no discretion.   The reasoning upon
which the decision is based is that neither of the three de-
partments into which the government is divided is subordi-
nate to or subject to the exercise of any control by another
department.   Upon this subject Justice Field said in *Mc-
Cauley* v. *Brooks,* 16 Cal. 11:   "There is nothing in this
distribution of powers which places either department above
the law or makes either independent of the other.   It simply
provides that there shall be three separate departments, and
it is only in a restricted sense that they are independent of
each other.   There is no such thing as absolute independ-
ence.   Where discretion is vested in terms or is necessarily
implied from the nature of the duties to be performed they
are independent of each other, but in no other case.   Where
discretion exists the power of each is absolute, but there is
no discretion where rights are vested under the constitution
or by existing laws."   The court referred to the power of
courts to declare a legislative enactment invalid, and the
power of the legislature to enact laws regulating the con-
duct of and proceedings in courts, and the power of the
legislature to impose duties of a ministerial character upon
the chief executive.   The court quotes from Story on the
Constitution, (vol. 1, sec. 525,) where the author says in
speaking of the independence of the departments of govern-
ment:   "It is not meant to affirm that they must be kept
wholly and entirely separate and distinct and have no com-
mon link of connection or .dependence, the one upon the
other, in the slightest degree.   The true meaning is that
the whole power of one of these departments shall not be

exercised by the same hands which possess the whole power of either of the other departments, as such exercise of the whole would subvert the principles of a free constitution." Continuing, Justice Field said in the case referred to: "The truth is, no officer, however high, is above the law, and when duties are imposed upon him in regard to which he has no discretion and in the execution of which individuals have a direct pecuniary interest, and there is no other plain, speedy and adequate remedy, he can be required to perform those duties by the compulsory process of *mandamus*."

In another California case, *Harpending* v. *Haight*, 39 Cal. 189, the court said: "And if it be conceded that the Governor, because he is chief of the executive department, enjoys for that reason an absolute immunity from all judicial process,—even when his duty in the given instance is ministerial and a citizen has a vested right to have it performed,—may not the same exemption from judicial process be set up by the officers of the executive department? * * * It seems to us the assertion of such a doctrine would draw after it the most serious complication and confusion both in public and private rights and practically disrupt the whole fabric of government."

The question was thoroughly discussed in *Martin* v. *Ingham*, 38 Kan. 641, and in a well considered opinion the court said: "In all other cases it is not the rank or character of the individual officer but the nature of the thing to be done which governs. No other officer is above the law, and every other officer, to whatever department he may belong, may be compelled to perform a purely ministerial duty. * * * It will be readily admitted that the courts cannot control any executive act of the Governor or any executive power conferred upon him; but may they not control ministerial power wherever placed? Is not ministerial power always inferior to judicial power and subject to judicial control? The recipient of ministerial power exercises no judgment,—no discretion,—but is simply bound

to obey the law under a given state of facts, and to construe this law and to ascertain these facts are peculiarly within the province of the courts."

In *People* v. *Bissell, supra,* the court admitted the view taken by it left the individual whose rights were involved without any remedy to enforce them, and said the only remedy was that provided by the constitution, of impeachment. In a separate opinion by one of the justices it was said the only remedy was to remit the Governor "to the high tribunals of his own conscience and the public judgment." This was noticed in the Kansas case, the court using the following language: "If an applicant for relief on the ground of the refusal to exercise or the wrongful exercise of ministerial power by the Governor has no remedy in the courts then he has no remedy at all. The remedy of impeachment and the remedy of subsequent elections, suggested by some of the courts, may be a remedy to the public in general, but it cannot be a remedy to an individual suffering for injuries or loss in person or to his property."

The court said in *Traynor* v. *Beckham, supra:* "The State and Federal governments are governments of laws—not of men. The citizen only gets the shadow of civil liberty,—not its essence,—when he has a legal right and is denied the right to enforce it."

The court said in *State* v. *Thayer,* 31 Neb. 82: "In a free government no officer is above the law and should not be permitted to disregard it with impunity. No good reason can be given why a Governor, whose duty it is to see that the laws are executed, should himself be permitted to set them at defiance."

In *State* v. *Brooks, supra,* it was said: "It may not be customary to impose ministerial duties upon the chief executive, but if they are so imposed, how can it be said that the character of the duty has been changed from one that is ministerial to one that is discretionary? The character of the duty must be determined by the nature of the act

to be performed and not by the office of the performer. * * * The duty being ministerial, we think the weight of authority and the better reasoning is in favor of the jurisdiction of the court to issue the writ and is not an assumption of executive powers. The court does not attempt to perform the act, but simply interprets the provisions of the constitution and laws under which the Governor is required to act. That is the peculiar province of the judiciary, and its interpretation of the laws is as binding on the executive as upon any other citizen."

In *State* v. *Moffitt,* 5 Ohio, 358, the court said: "The Governor of Ohio is no less answerable to the operation of the law than the most humble citizen, and it is to be hoped that no citizen will ever fill that important office who entertains a different sentiment."

The right to the writ directed to the Governor "to compel the performance of clear, legal and mandatory duties" was sustained in *State* v. *Nash,* 66 Ohio, 612, in which case the court said: "The legislative, executive and judicial departments of the State government are not so absolutely distinct that an arbitrary exercise of power,—or, what is the same thing, an arbitrary refusal to exercise power,— could not be checked or opposed by either of the other departments. Such a theory is opposed to the principle of checks and balances, upon which the Federal and State constitutions have been framed. Indeed, it does not seem clear to us, if the judicial department may annul an act of the legislature by declaring it unconstitutional, why it may not constitutionally exercise its functions in requiring the executive department to perform a clear legal duty which it neglects or refuses to perform. Neither are we ready to acknowledge that any office or officer is so high that the law cannot reach him."

In *Marbury* v. *Madison,* 1 Cranch, 137, was involved the power to issue a writ of *mandamus* against the Secretary of State of the United States. The court, after re-

ferring to the fact that duties of an executive officer of a political nature could not be controlled or interfered with by the courts, said: "But if this be not such a question; if, so far from being an intrusion into the secrets of the cabinet, it respects a paper which, according to law, is upon record and to a copy of which the law gives a right on the payment of ten cents; if it be no intermeddling with a subject over which the executive can be considered as having exercised any control; what is there in the exalted station of the officer which shall bar a citizen from asserting in a court of justice his legal rights, or shall forbid a court to listen to the claim or to issue a *mandamus* directing the performance of a duty not depending on executive discretion but on particular acts of Congress and the general principles of law? If one of the heads of departments commits any illegal act under color of his office by which an individual sustains an injury, it cannot be pretended that his office, alone, exempts him from being sued in the ordinary mode of proceeding and being compelled to obey the judgment of the law. How, then, can his office exempt him from this particular mode of deciding on the legality of his conduct if the case be such a case as would, were any other individual the party complained of, authorize the process? It is not by the office of the person to whom the writ is directed but the nature of the thing to be done that the propriety or impropriety of issuing a *mandamus* is to be determined. * * * But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President and the performance of which the President cannot lawfully forbid and therefore is never presumed to have forbidden,—as, for example, to record a commission or a patent for land which has received all the legal solemnities, or to give a copy of such record,—in such cases it is not perceived on what ground the courts of the country are further excused from the duty of giving judg-

ment that right be done to an injured individual. than if the same services were to be performed by a person not the head of a department."

There can be no doubt that duties of a ministerial character may by legislative action be imposed upon an executive officer. The Supreme Court of the United States in *Kendall* v. *United States,* 12 Pet. 524, said: "There are certain political duties imposed upon many officers in the executive department the discharge of which is under the direction of the President. But it would be an alarming doctrine that Congress cannot impose upon any executive officer any duty they may think proper which is not repugnant to any rights secured and protected by the constitution, and in such cases the duty and responsibility grow out of and are subject to the control of the law and not to the direction of the President; and this is emphatically the case where the duty enjoined is of a mere ministerial character." In that case the writ was asked against the Postmaster General, and the court further said: "The *mandamus* does not seek to direct or control the Postmaster General in the discharge of any official duty partaking. in any respect of an executive character but to enforce the performance of a mere ministerial act, which neither he nor the President had any authority to deny or control."

The right to enjoin a board of which the Governor of the State was a member was considered by the Supreme Court of the United States in *Board of Liquidation* v. *Mc-Comb,* 92 U. S. 531. The court said: "But it has been well settled that when a plain official duty requiring no exercise of discretion is to be performed and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive· official act, any person who will sustain personal injury thereby for which adequate compensation can not be had at law may have an injunction to prevent it.

In such cases the writs of *mandamus* and injunction are somewhat correlative to each other."

In *United States* v. *Black*, 128 U. S. 40, the court, after referring to the decisions in *Kendall* v. *United States, supra,* and *Decatur* v. *Paulding*, 14 Pet. 497, said: "The principle of law deducible from these two cases is not difficult to announce. The court will not interfere by *mandamus* with the executive officers of the government in the exercise of their ordinary official duties even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act in a case at all, or when, by special statute or otherwise, a mere ministerial duty is imposed upon them,—that is, a service which they are bound to perform without further question,—then, if they refuse, a *mandamus* may be issued to compel them."

A writ of *mandamus* was asked against the Secretary of State of the United States in *United States* v. *Blaine*, 139 U. S. 306. In discussing the difference between executive and ministerial duties of an executive officer Chief Justice Fuller said: "The writ of *mandamus* cannot issue in a case where its effect is to direct or control the head of an executive department in the discharge of an executive duty involving the exercise of judgment or discretion. (*United States ex rel.* v. *Windom*, 137 U. S. 636-644.) When, by special statute or otherwise, a mere ministerial duty is imposed upon the executive officers of the government,—that is, a service which they are bound to perform without further question,—then, if they refuse, the *mandamus* may be issued to compel them. (*United States ex rel.* v. *Black*, 128 U. S. 40-48.) The writ goes to compel a party to do that which it is his duty to do without it."

This subject is discussed and the decisions of various courts referred to in Bailey's Treatise on Habeas Corpus and Special Remedies. (Vol. 2, chap. 4.) The author expresses his conclusion to be that the decisions holding a

writ of *mandamus* will not issue to compel an executive officer to discharge a purely ministerial duty rest upon no solid foundation of principle, reason or argument.

This court has recently granted leave to relators to file original petitions for writs of *mandamus* against the State board of canvassers, of which the Governor was a member. (*People* v. *Deneen,* 256 Ill. 536; *People* v. *Deneen,* id. 436; *People* v. *Deneen,* 247 id. 289.) In each of those cases the right to the writ was considered on its merits, and it was held that the relator failed to make a case showing he was entitled to the writ and on that ground the writ was denied, but want of jurisdiction to issue the writ against the Governor was not suggested as a reason for the denial. In the last case mentioned, reported in 247 Ill., four members of the court agreed that on the merits of the case the relator had no right to the writ. Three of the justices of the court filed a dissenting opinion, in which they stated that in their opinion the writ should have been awarded, and it seems clear that in each of the three cases if the relator had shown a clear right to the relief sought the writ would have been awarded.

It would be superfluous for us to attempt further argument of the principles which apply to and should govern cases of this character. It is admitted the relator rendered the services for which he claims compensation. The law fixes that compensation and the Governor has no discretion except to approve the vouchers. No officer, however high, is above the law. To hold that a chief executive of a State, because he is such executive, may disregard the performance of a plain ministerial act or duty smacks too much of the old theory that "the king can do no wrong." That doctrine is not applicable in a republic, where the people are sovereign and not the executive, who derives his power from the people.

In our judgment the circuit court erred in sustaining the demurrer to the petition.