## Z. & F. ASSETS REALIZATION CORP. *v.* HULL, SECRETARY OF STATE, ET AL.*

No. 381.   Argued December 9, 10, 1940.—Decided January 6, 1941.

---

*Together with No. 382, *American-Hawaiian Steamship Co. v. Hull, Secretary of State, et al.,* also on writ of certiorari, *post,* p. 632, to the Court of Appeals for the District of Columbia.

*Mr. Joseph M. Proskauer,* with whom *Messrs. Frank Roberson, John F. Condon, Jr.,* and *John Bassett Moore* were on the brief, for Z. & F. Assets Realization Corp., petitioner in No. 381.

474

*Mr. Fred K. Nielsen* for American-Hawaiian Steamship Company, petitioner in No. 382.

476

*Solicitor General Biddle,* with whom *Assistant Attorney General Shea,* and *Messrs. Melvin H. Siegel* and *Francis J. McNamara* were on the brief, for Cordell Hull, Secretary of State, and Henry Morgenthau, Secretary of the Treasury, respondents.

*Mr. William D. Mitchell,* with whom *Messrs. Frederic R. Coudert, Lester H. Woolsey, Amos J. Peaslee,* and *John J. McCloy* were on the brief, for Lehigh Valley Railroad Company, intervener-respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Petitioners, Z. & F. Assets Realization Corporation and American-Hawaiian Steamship Company, are holders of awards of the Mixed Claims Commission, United States and Germany. These awards have been certified by the Secretary of State and are thus payable out of the fund established by the Settlement of War Claims Act of 1928.[1] Petitioners seek a judgment declaring that later awards purporting to be made by the Mixed Claims Commission in favor of the Lehigh Valley Railroad Company, the Agency of Canadian Car and Foundry Company, Limited, the Bethlehem Steel Company and others, are null and void, and restraining the certification of these awards by the Secretary of State and their payment by the Secretary of the Treasury. The Lehigh Valley Railroad Company intervened as a defendant.

Defendants, the Secretary of State and the Secretary of the Treasury, moved to dismiss petitioners' bills for want of jurisdiction and for failure to state a claim upon which relief could be granted. The intervener defendant filed an answer and moved for summary judgment. The District Court dismissed the bills (31 F. Supp. 371) and its judgment was affirmed by the Court of Appeals. 114 F. 2d 464. We granted certiorari, *post*, p. 632.

The Mixed Claims Commission, United States and Germany, was set up pursuant to an agreement of August 10, 1922,[2] to determine the amount to be paid by Germany in satisfaction of her financial obligations under the Treaty of Berlin of August 25, 1921.[3] The Commission consisted of three members, one appointed by the United States, another by Germany, and an Umpire se-

---

[1] 45 Stat. 254.

[2] 42 Stat. 2200.

[3] 42 Stat. 1939.

lected by the two Governments. The Umpire was "to
decide upon any cases concerning which the commission-
ers may disagree, or upon any points of difference that
may arise in the course of their proceedings." It was fur-
ther provided that should the Umpire or any of the
Commissioners die or retire, or be unable for any reason
to discharge his functions, the vacancy should be filled
in the same manner as the original appointment. It was
agreed that the decisions of the Commission and those
of the Umpire should be accepted as final and binding
upon the two Governments.

The Settlement of War Claims Act of 1928 created in
the Treasury a "German Special Deposit Account." Sec-
tion 2 provided that the Secretary of State should certify
from time to time to the Secretary of the Treasury the
awards of the Mixed Claims Commission, and the Secre-
tary of the Treasury was directed to pay out of the
amounts placed in the account the principal of each
award so certified, with interest as stated.

The claims covered by the awards attacked by peti-
tioners arose out of the destruction of property caused by
explosions at Black Tom and Kingsland, New Jersey, in
1916 and 1917. These claims were dismissed by the Com-
mission in 1930, and petitions for rehearing were denied
in 1931 and 1932. In the following year the American
agent sought to reopen the cases upon the ground that
in its decision of 1930 the Commission had been misled
by "fraudulent, incomplete, collusive and false evidence"
on the part of witnesses for Germany. The German
Government denied the power of the Commission to re-
open and the Umpire, Mr. Justice Roberts, finding that
there was a disagreement upon the question between the
Commissioners, decided, in December, 1933, that the
Commission was competent to determine its own juris-
diction by the interpretation of the Agreement creating
it. The Umpire further decided that, while the Com-

mission was without power to reopen a case merely for the presentation of after-discovered evidence, the Commission was still sitting as a court and did have power to consider the charge that it had been misled by fraud and collusion, and for that purpose to reopen the cases in order that it might consider the further evidence tendered by the American agent, and that offered in reply on behalf of Germany, and either confirm the decisions theretofore made or alter them as justice and right might demand.

Thereafter, the German agent filed an answer denying the allegations of fraud and evidence was presented. After argument, the Commission, in June, 1936, rendered a decision, the German Commissioner concurring, by which the ruling of 1932 denying a rehearing was set aside, and the question whether there should be a rehearing was reserved for a hearing which should be separate and distinct from an argument on the merits unless Germany should consent to a different course.

Efforts to obtain a settlement of the claims were unsuccessful and, after much additional evidence had been introduced, the Commission, in January, 1939, heard extended arguments by the agents of the respective Governments. The American agent had requested that the Commission should not only set aside the original decision of 1930 but should also proceed to a final decision on the merits, as it was contended that the evidence presented to support the application for rehearing also established the responsibility of Germany for the destruction of the property as claimed. It also appears that the German Commissioner insisted that, before the motion for rehearing should be granted, the Commission should examine the proofs tendered by the United States to determine whether the claims had been made good. This, as stated by the Umpire, was upon the ground that even though the Commission had been misled by false and

fraudulent testimony, that would be immaterial if, upon an independent consideration, the United States in its own cases had failed to sustain its burden of proof. The American Commissioner and the Umpire thereupon had agreed to go beyond what they thought the necessary function of the Commission in the circumstances and had proceeded to canvass with the German Commissioner the cases as made by the United States.

During the course of that investigation, on March 1, 1939, the German Commissioner withdrew from the Commission. At the time of his withdrawal, the two Commissioners, according to the contention of the American Commissioner and as found by the Umpire, were in disagreement upon the points in issue. On receiving notice of a meeting of the Commission to be held on June 15, 1939, the German agent said that he would not appear and the German Embassy advised the Secretary of State that, since the withdrawal of the German Commissioner, the Commission was incompetent to make decisions.

At the meeting held pursuant to the notice, the American Commissioner filed a certificate of disagreement with an opinion sustaining the jurisdiction of the Commission. The Umpire thereupon decided that there did exist a disagreement between the two Commissioners,—a disagreement of which he was personally cognizant and which was also shown by the certificate and opinion of the American Commissioner; that the jurisdiction of the Commission was not ousted by the withdrawal of the German Commissioner "after submission by the parties, and after the tribunal, having taken the cases under advisement, pursuant to its rules, was engaged in the task of deciding the issues presented"; that the United States "had proved its allegation that fraud in the evidence presented by Germany misled the Commission and affected its decision in favor of Germany"; and that upon

the record as it then stood the cases for the claims were made out.

Thereupon, the American agent moved for awards in favor of the United States on behalf of the sabotage claimants. An order was entered setting aside the decision of 1930, and determining that the liability of Germany had been established and that, as it appeared that Germany did not intend to take part in further proceedings of the Commission, awards should be made upon the Commission's findings and opinion.

On October 3, 1939, the German Chargé d'Affaires ad- dressed an elaborate communication to the Secretary of State making a detailed statement supplementary to a note of July 11, 1939, with respect to the alleged illegal acts of the Umpire, and protesting against all further measures by the Umpire, the American Commissioner and the American agent, which were aimed at securing awards in the Black Tom and Kingsland cases. The Secretary of State replied, on October 18, 1939, that it would be highly inappropriate for the Department to endeavor to determine the course of the proceedings of the Commission; that the Secretary had entire confidence in the ability and integrity of the Umpire and the Commissioner appointed by the United States despite the severe and, as he believed, "entirely unwarranted criticisms," and that he was constrained to invite attention to the fact "that the remarkable action of the Commissioner appointed by Germany was apparently designed to frustrate or postpone indefinitely the work of the Commission at a time when, after years of labor on the particular cases involved, it was expected that its functions would be brought to a conclusion."

Notice was given of a meeting of the Commission to be held on October 30, 1939, which the German Commissioner did not attend, and awards were then made in favor of the claimants. The Umpire stated that he

had found the awards to be accurately and properly calculated and had joined the American Commissioner in signing them.

The awards were certified by the Secretary of State to the Secretary of the Treasury on October 31, 1939, pursuant to the Settlement of War Claims Act of 1928. On the same day, this suit was brought, the complaint being filed before, and process being served on the Secretary of State after, his certification of the awards.

The Court of Appeals has held that the question with respect to the validity of the awards in favor of the sabotage claimants is political in its nature and that the District Court was without jurisdiction to entertain it.

There are, however, certain preliminary questions which are indubitably appropriate for judicial consideration, and we think that the proper answer to these questions is determinative of the whole case.

The first question is whether petitioners have standing to bring this suit. Except for the situation created by the Settlement of War Claims Act of 1928, they would have no such standing. They could not be heard to complain of action upon claims other than their own. And Congress, with or without awards, could provide for the payment of the claims in question without let or hindrance by petitioners. But petitioners contend that the Settlement of War Claims Act created a fund in the Treasury, known as the "German Special Deposit Account"; that petitioners with other earlier award-holders are entitled by the Act to payment out of that fund; that the fund is insufficient to pay petitioners' claims in full if payments are permitted to be made to the sabotage claimants; and hence that petitioners have standing to complain of an unlawful depletion of the fund to their injury by means of such payments.

We think that in these circumstances as shown by the bills petitioners are entitled to sue to protect such inter-

ests as they may have under the Act. Compare *Houston* v. *Ormes*, 252 U. S. 469; *Mellon* v. *Orinoco Iron Co.*, 266 U. S. 121. But as their standing rests solely upon the provisions of the Act, they may not escape its terms or succeed in a challenge to payments for which the Act is found to provide.

The next question is with respect to the effect that should be given under the terms of the statute to the action of the Secretary of State in certifying the awards. Congress has authorized and required the Secretary of the Treasury to pay out of the special account the awards which the Secretary of State has certified. There is no question that the Secretary of State has given his certificate in this instance. It is adequate in form and substance under the terms of the Act.

Petitioners contend that the certification is a mere ministerial act. It is said to mean merely that the award is a genuine document, in the same sense that a notary public authenticates the signature of a grantor in a deed. We think that this construction of the Act is inadmissible. The notarial conception of the function of the Secretary of State in this matter ignores his rôle in the conduct of foreign affairs as the right hand of the Executive and in particular his relation to proceedings for the determination of claims of the United States against foreign governments. There can be no doubt of the constitutional authority of Congress to lodge with the Secretary of State the authority to consider and pass upon the regularity and validity of the awards made by the Mixed Claims Commission for the statutory purpose of qualifying them for payment out of the account in the Treasury. Congress had complete power to decide what payments should be made from that account and to attach such conditions as it saw fit. Congress not only had this power but it was natural and appropriate that Congress should entrust to the Secretary of State the decision

of questions that might arise with respect to the propriety of the payment of awards made by the Commission and to require his affirmative action through certification before payment. The Mixed Claims Commission had been created by an executive agreement. The claims to be considered by the Commission were only those sponsored and presented by the United States against Germany. They were presented as claims of the United States, the national claimants themselves having no standing save as they were represented by the United States. See *Frelinghuysen* v. *Key,* 110 U. S. 63, 75, 76; *Boynton* v. *Blaine,* 139 U. S. 306, 323, 325; *Williams* v. *Heard,* 140 U. S. 529, 537, 538. The claims so sponsored were presented and handled by an American agent appointed by the President. It was obvious, as the present contentions abundantly illustrate, that the proceedings before such a commission might easily give rise to questions between the governments concerned and might involve diplomatic representations or protests with which it would be the duty of the Secretary of State to deal. Whatever might be said of such representations or protests, or the occasion for them, or with respect to the existence of any international right or obligation arising from the agreement setting up the Commission, Congress could, and naturally would, require the views of the Secretary of State before appropriating money for the payment of awards, and, in creating a special fund for that purpose, would look to the Secretary of State for the exercise of his appropriate authority on behalf of the Executive and thus for his judgment upon the question whether the proceedings had been such as duly to qualify the awards for payment. See *Frelinghuysen* v. *Key, supra; Boynton* v. *Blaine, supra.* We find nothing in the Settlement of War Claims A which points to a different purpose.

It is suggested that the Secretary of State construed his action in certifying as merely ministerial because he acted at once on the presentation of the awards. But the argument overlooks the fact that the Secretary of State had long been cognizant of the questions that had arisen in relation to the Commission's authority to grant a rehearing and make the awards. As early as October, 1933, the German Government had notified the Secretary of State that it regarded the Commission as without authority to grant a rehearing on the sabotage claims. The Secretary of State had informed the American agent that the question of jurisdiction was one properly to be decided by the Commission itself and he directed the American agent to bring the matter to the attention of the American Commissioner, or the full Commission, for the purpose of obtaining the decision of the Umpire on that disputed point. In March, 1939, the American Commissioner informed the Secretary of State of the withdrawal of the German Commissioner and reviewed the circumstances. In June, 1939, petitioners themselves formally communicated to the Secretary of State their objections to the proceedings. In the same month the German Embassy advised the Secretary of State that its Government regarded the Commission as incompetent to make decisions because of the German Commissioner's withdrawal. This was followed by a further protest delivered to the Secretary of State in July and a detailed statement by the German Government of its grounds in its communication of October 3, 1939, to which the Secretary of State replied on October 18, 1939, in the note from which we have quoted. Thus, when the actual awards were presented the Secretary of State had before him these diplomatic representations and was fully conversant with all the proceedings of the Commission, with the action of the German Commissioner and the attitude of his Government, and with the contentions of peti-

tioners. We find no basis for concluding that the Secretary of State in certifying the awards did not act after due deliberation or fail to express his considerate judgment, as we think the statute contemplated.

We are of the opinion that for the purpose of payment under the statute the certificate of the Secretary of State must be deemed to be conclusive. We do not need to consider whether Congress could commit to the judiciary the determination of the validity of the challenged claims (See *La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423), for Congress has not done so but has made payment out of the fund depend upon the Secretary's certificate. The question in this relation is simply one of the intent of Congress as disclosed by the Act. Congress has expressly directed payments to be made from the special account of the awards "so certified." The literal and natural import of this provision is that finality is to be accorded to the certificate of the Secretary of State and we perceive no ground for limiting the terms of the Act by construction. On the contrary, the nature of the questions presented and their relation to the conduct of foreign affairs within the province of the Secretary of State support the conclusion that the statute should have effect according to its explicit terms.

In view of the statutory provisions governing this case, we have no occasion to consider the circumstances in which an international agreement, or action thereunder, may be deemed to vest rights in private persons, or the scope of such rights in particular cases. See *Comegys* v. *Vasse*, 1 Pet. 193; *Mellon* v. *Orinoco Iron Co., supra*. Petitioners must claim solely by virtue of their interest in the fund created by the statute and under its terms they are not entitled to complain of payments out of that fund of awards which the Secretary of State has certified.

The judgment of the Court of Appeals is

*Affirmed.*

[Over.]

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, concurring:

MR. JUSTICE DOUGLAS and I concur in the judgment of affirmance but on the ground that the petitioners set up no justiciable controversy which the court had power to determine. The questions raised by the petitions involve relations between the United States and Germany, which we believe are constitutionally committed exclusively to the legislative and executive departments.

The sole ground upon which petitioners prayed relief in the District Court was that awards made by the Mixed Claims Commission were "wholly null and void and without jurisdiction on the part of the alleged Commission." A declaratory judgment was sought to have the awards declared null and void, and to enjoin the Secretary of State from certifying and the Secretary of the Treasury from paying such awards made by the Commission. In addition petitioners asked a mandatory injunction to require the Secretary of the Treasury to pay petitioners without regard to other awards of the Commission certified by the Secretary of State.

The Secretary of State and the Secretary of the Treasury moved to dismiss on the grounds, among others, that the complaint stated no cause of action; the court had no jurisdiction to review the action of the Mixed Claims Commission; the court was without power to pass upon the jurisdiction of the Mixed Claims Commission; and the court had no jurisdiction to restrain the Secretary of State from certifying awards of the Commission or to enjoin the Secretary of the Treasury from paying the claims so certified. The District Court dismissed and the Circuit Court of Appeals affirmed on the ground that the actions of the Mixed Claims Commission in making awards and the Secretary of State in certifying

them were committed for determination to the political department of government and therefore the courts were without power to review their determination. We agree with their conclusion. And in this view we believe the certifications of the Secretary of State must be deemed final and conclusive in the courts, not because the conduct of the Secretary and the Commission preceding certification meets approval of the courts, but because power to make final determination rests with the political departments of government alone.

The fundamental questions raised by the petitions as presented to the District Court, were: Who can challenge the propriety of the Commission's awards? Does the judicial branch of government, rather than the political, possess the power finally to determine the propriety of the awards? And the fact that petitioners sought to challenge the Commission's power by proceedings against the Secretaries of State and the Treasury, and not by direct suit against the Commission, is immaterial. If petitioners cannot directly attack the Commission in the courts, neither can they, in the absence of Congressional consent, assail the propriety of its awards through the expedient of suits against others charged with responsibility for executing the final determination of the Commission.

The Mixed Claims Commission was set up pursuant to an agreement between the United States and Germany. The agreement gave the Commission full power to hold hearings to determine "the amount to be paid by Germany in satisfaction of Germany's financial obligations" under two treaties previously made between the two countries. The agreement further provided that "the decisions of the Commission and those of the Umpire (in case there may be any) shall be accepted as final and binding upon the two governments." The Commission was set up with an Umpire and all of the awards

492

were reported to the Secretary of State by the Commission.

While petitioners contend that they have the right to challenge the certification of the Secretary of State, it is to be remembered that their petitions ultimately rest solely upon the premise that it is his duty to refuse to carry out the Commission's awards because of alleged impropriety of the proceedings of the Commission. They say that the Commission was without jurisdiction and power to make awards to certain claimants other than themselves; payment of these awards out of a fund that is limited in amount will result in diminishing payments to them below the full amount of their award with interest; since the Commission was without power— as they charge—to make these other awards, the Secretary of State should not have certified them for payment; and for the same reason the Treasury should not pay them. They assert a right through court procedure to challenge payment to the other claimants by reason of an Act of Congress of 1928.[1]

But the 1928 Act provides that the Secretary shall from time to time certify to the Secretary of the Treasury the awards of the Mixed Claims Commission of the United States, and that the Secretary of the Treasury is authorized and directed to pay "the principal of each award so certified, plus the interest thereon, in accordance with the award, . . ." Nowhere in the Act is there any language which either expressly or by fair implication indicates a purpose of Congress to permit some claimants to resort to the courts—as petitioners here have done—to determine the propriety of awards by the Mixed Claims Commission to other claimants.

The exact challenge made by petitioners against the awards of the Commission is the subject of a diplomatic

---

[1] 45 Stat. 254.

controversy between the United States and Germany. Germany's contention is the same as petitioners'. And the Secretary of State, in charge of our foreign affairs, has declined to accede to Germany's contention that the particular awards here in controversy were improper and should not be certified or paid. The immediate subject matter of petitioners' complaint, upon which rests the power of the Court to act, if it has any power, has therefore been repudiated by the political branch of our government. A contrary conclusion by the courts would bring about a square clash between the executive and judicial branches of government. And far more than this. Whoever is entrusted finally to determine what government must or must not do in a dispute between nations is the ultimate arbiter of momentous questions of public policies affecting this nation's relations with the other countries of the world.

The controversy here bears all the earmarks of that type of controversies which our Constitution has confided exclusively to the executive or political departments of government, and concerning which this Court has many times repeated "that the action of the political branches of the government in a matter that belongs to them, is conclusive." [2] Since this clearly appeared from the face of the pleadings at the very outset, the District Court properly stayed its hands and renounced power to proceed.

---

[2] *Williams* v. *Suffolk Insurance Co.*, 13 Pet. 415, 420; *United States ex rel. Boynton* v. *Blaine*, 139 U. S. 306, 320, 321, 322–6; *Frelinghuysen* v. *Key*, 110 U. S. 63. No good purpose would be served by setting out the numerous decisions of this Court to the same effect. For a collection of such cases see Digest of the U. S. Supreme Court Reports, vol. 4, Courts, §§ 49–63.