FEDERICO STALLFORTH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5926.   Promulgated January 29, 1946.

*John Wattawa, Esq.*, for the petitioner.
*Francis S. Gettle, Esq.*, for the respondent.

**152**

**OPINION.**

Disney, *Judge*: The petitioner contends that compensation received by him in 1941 for services rendered over a period from September 3, 1935, to January 10, 1941, was, in determining the deficiency for 1941, erroneously included in gross income and that his tax liability should be computed under the provisions of section 107 (a), Internal Revenue Code.[1] The respondent contends that petitioner's tax liability is not determinable under section 107 (a) because the compensation received in 1941 was not in payment of services covering a period of sixty calendar months or more as required by that section, but that the services for which the compensation was paid in

---

[1] SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF SIXTY MONTHS OR MORE AND BACK PAY.

(a) PERSONAL SERVICES.—If at least 75 per centum of the total compensation for personal services covering a period of sixty calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual. [As amended by sec. 119 (b), Act 1942.]

 *　　*　　*　　*　　*　　*　　*

(c) FRACTIONAL PARTS OF A MONTH.—For the purposes of this section a fractional part of a month shall be disregarded unless it amounts to more than half a month, in which case it shall be considered as a month.

1941 began in November 1935 and terminated on or about July 26, 1939, and hence the services covered a period of only forty-five months.

In his 1941 income tax return the petitioner reported no income whatever. In determining the deficiency the Commissioner included in taxable income $150,645.36 ($168,645.36 gross income, less $18,000 deductible expenses) as compensation received and allowed a deduction of $2,230.26 interest paid.

The amount received by petitioner as compensation in 1941 is not in dispute, nor is it disputed that the amount received was compensation for personal services rendered by him, and that the amount received in 1941 represented at least 75 per centum of the total compensation received. The parties disagree as to the period during which his services were rendered.

That petitioner's services began in November 1935 and that such month is includible in determining the period fixed by the statute is conceded by the respondent. In our opinion the evidence would not support a finding that petitioner's employment commenced prior to November 1935.

In support of his contention that petitioner's services for which the compensation was paid in 1941 were concluded in July 1939, the respondent states, among other things, that the compensation was paid under the last agreement of July 26, 1939; that such agreement did not require the performance of further or additional services; that the German Government never contested the decision of the Mixed Claims Commission of June 15, 1939, or the awards made pursuant thereto; that nothing resulted insofar as the sabotage claims were concerned from the conversations and conferences which petitioner held in Rome and in Berlin in 1940; that in 1939 Europe was in a state of war and petitioner was in no position to negotiate any further with the German Government with respect to the sabotage claims; that petitioner performed no services in obtaining evidence of any kind and submitting the same to the Commission; and that in view of the favorable decision of the Mixed Claims Commission of June 15, 1939, its awards on October 30, 1939, and the certification of the awards by the Secretary of State to the Secretary of the Treasury on October 31, 1939, there was nothing which the petitioner could have done thereafter toward settling the sabotage claims.

The record shows clearly that the agreements of February 2, 1938, and July 26, 1939, were negotiated and entered into between petitioner and Peto, an official of both the Canadian Co. and Agency and the one most active throughout the prosecution of the claims, and that at least from 1938 on, petitioner's dealings were primarily with Peto. Peto testified that he entered into the contract of July 26, 1939, with peti-

tioner because "we wished to retain his services throughout"; that he agreed to retain petitioner's services "on his representations that he still thought that he could get the German Government not to take any active steps in opposing the decision of the Mixed Claims Commission"; that the agreement of July 26, 1939, was "a compromise for Mr. Stallforth's services up to the time when the case was settled one way or the other"; that his company had call upon petitioner's services in connection with the claims until January 10, 1941; and that "we did carry Mr. Stallforth and demand his services because we expected to use him if, as and when the Supreme Court rendered a decision unfavorable to our cause." The record further shows that the petitioner did render services at various times throughout 1938, 1939, and 1940 at the request of Peto or McCloy or with their active cooperation and knowledge, and that during the years from 1935 to 1941 petitioner was reimbursed by Agency for expenses incurred by him during such period in rendering such services, including expenses incurred on his trip to Europe in 1940. McCloy, although not chief counsel for Agency, acted as counsel for it in certain matters connected with the claims. Obviously Agency would not have reimbursed petitioner for such expenses had his services not been performed at its request and in its behalf. That nothing resulted from petitioner's negotiations is not material. It appears also that the refusal of the German agent to sign the formal papers necessary for the submission of the Munich agreement to the Commission was due in large part to the efforts and opposition of the prior award holders to the carrying out of such agreement and the allowance of the sabotage claims, although the great majority of awards to the protesting award holders had been entered following settlements reached in substantially the same manner as was the Munich settlement; that on March 1, 1939, the German commissioner withdrew from the Commission; that on receiving notice of a meeting of the Commission to be held on June 15, 1939, the German Embassy advised the Secretary of State that, since the withdrawal of the German commissioner, the Commission was incompetent to make decisions, and that on October 3, 1939, the German Charge d'Affaires addressed an elaborate communication to the Secretary of State making a detailed statement with respect to the alleged illegal acts of the umpire in making his decision of June 15, 1939, and protesting against all further measures by the umpire, the American commissioner and the American agent which were aimed at securing awards in the Black Tom and Kingsland cases. (*Z. & F. Assets Realization Corporation* v. *Hull*, 311 U. S. 470, 483, 484.) The action of the German commissioner and the position taken by the German Government gave the prior award holders grounds for bringing their suit to restrain payment of the awards. No one knew what the decision of the Court of Appeals would be, and the same is true of the decision of the Supreme

Court. Counsel for the German shipowners and award holders testified that he was consulted by counsel for the American award holders prior to the institution of the proceedings in the District Court, and he and other counsel were of the opinion that the Mixed Claims Commission was *functus officio* and that the awards were invalid, and that this opinion in that connection was heightened by the granting of certiorari by the Supreme Court. He also corroborated petitioner's testimony that after October 30, 1939, negotiations were under way between the sabotage claimants and the two American award holders who had brought suit, and others, to end the litigation, and that petitioner conferred with him in that respect on several occasions. Under the circumstances the continued efforts of Peto and petitioner to obtain the consent of the German Government to the entry of the awards or to settle with the prior award holders were not wholly without reason or unjustified. In any event the services were performed by petitioner. The fact that petitioner had a personal interest in the payment of the awards because the payment of his compensation depended thereon is unimportant; so too, is the fact that he performed no services in connection with the litigation before the Commission. He was not employed to render any services in that respect.

The respondent relies heavily upon the testimony of Michael A. Loughman, secretary-treasurer of Agency since 1936. He testified categorically that Agency was perfectly satisfied with the decision of the Commission of June 15, 1939; that it was interested neither in any compromise of the matter after October 30, 1939, nor in the revival of the Munich agreement, because under the decision of the Commission the claimants would receive a great deal more than they would under the Munich agreement; and that petitioner, so far as he knew, did not render any services to Agency after the decision of June 15, 1939. However, he also testified that he was assistant to Peto in connection with the claims until January 10, 1941; that his duties as such were to locate witnesses and get evidence and consult with counsel as to the preparation of briefs; that he traveled "around the country and down to Central America" and was over in Europe for the purpose of locating witnesses and getting evidence; that no oral testimony was taken before the Commission until about 1936 or 1937; that he did not go to Europe at the time the Munich agreement was made; that he was not consulted by either Peto or Peaslee with reference to the employment of petitioner in 1935 or with respect to the contract of December 19, 1935; that Peto did not consult with him with respect to the fee arrangements prior to their being made with petitioner, and that he did not consult him with reference to the agreement of July 26, 1939. Since Loughman's attention was primarily directed to the proceedings before the Commission. and in view of his testimony that he was not

consulted as to the employment of petitioner and later arrangements made with him, the testimony of Peto, who directly negotiated with petitioner and cooperated with him in his efforts after October 31, 1939, is more persuasive than that of Loughman. Peto, too, testified that his company was satisfied with the decision of the Commission on June 15, 1939, but he also testified that he was informed by counsel for the German award holders and counsel for the American award holders, who later brought suit at the time the German commission withdrew, that they would contest any favorable decision made in the absence of the German commissioner. Peto, in our view, had a greater over-all knowledge of the entire proceedings and negotiations than did Loughman.

The respondent urges that the petitioner in August 1939 filed with the collector an offer in compromise, not disclosing his interest in the contract herein involved. We think the point of not much importance, first, because the financial statement attached to the offer was as of March 31, 1939, a time when, under the record before us, the chances of recovery under the contract appeared very slight, and, second, because in the course of an investigation by revenue agents later that year and during January 1940 petitioner disclosed to one of the revenue agents that he had an interest in a matter before the Mixed Claims Commission, the Black Tom matter, and was told that if it was the Black Tom matter he would never receive anything, to forget it, and that they, the agents, wanted real assets, not dreams. All this gives a minimum of assistance in the determination as to the period covered by petitioner's activities and services in which the amount involved was earned.

Upon a careful consideration of all the evidence, we are of the opinion, and have so found as a fact, that petitioner's services, for which he received compensation in 1941, were rendered from November 1935 through 1940. Hence, his tax liability for 1941 is to be computed according to the provisions of section 107 (a).

The petitioner further contends that the compensation received in 1941 "allocable" to 1936 and 1937 under section 107 (a) is excludible from gross income of such years under the provisions of section 116 (a) of the Internal Revenue Code,[2] since he was a citizen of the

---

[2] SEC. 116. EXCLUSIONS FROM GROSS INCOME.

In addition to the items specified in section 22 (b), the following items shall not be included in gross income and shall be exempt from taxation under this chapter:

(a) EARNED INCOME FROM SOURCES WITHOUT UNITED STATES.—In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from without the United States (except amounts paid by the United States or any agency thereof) if such amounts would constitute earned income as defined in section 25 (a) if received from sources within the United States, but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection.

United States but a bona fide nonresident thereof for more than six months during 1936 and 1937.

The respondent contends that, since the petitioner was not a bona fide nonresident for the statutory period of more than six months in 1941 and since his tax return was made on a cash basis, he is not entitled to the benefits of section 116 (a), citing *Muhleman* v. *Hoey* (C. C. A., 2d Cir.), 124 Fed. (2d) 414.

Petitioner makes no claims that he was out of the United States more than six months in 1941. It is indicated in the record that petitioner left this country on April 12, 1941, and returned on September 27, 1941, a period less than six months. It is argued by petitioner that the amounts of the compensation received in 1941 "allocable" to 1936 and 1937 must be looked upon as actually received in 1936 and 1937, respectively, under section 107 (a); that if a taxpayer had actually received the compensation ratably over the period September 1935 through December 1940 and in addition met the requirements of section 116 (a) as to 1936 and 1937, the amounts in those two years would have been excluded from gross income and exempted from taxation, therefore a like relief should be available to a taxpayer when the amounts are considered as received in 1936 and 1937 "in the eyes of the law," i. e., under section 107 (a); that amounts actually received in certain years should not be treated differently under section 116 (a) than amounts considered under section 107 (a) as received in certain years; and that sections 107 (a) and 116 (a) are not mutually exclusive, but that they are complementary.

In *Julius B. B. Stryker*, 29 B. T. A. 1025, the taxpayer in 1928 received compensation for services rendered in 1927 of which he claimed 140/365 was properly taxable in 1928 and 225/365 in 1927, since he spent 225 days in Java during 1927, upon the theory that the term "during the taxable year" in section 116 (a) meant the year in which the services were performed and compensation earned rather than the year in which the compensation was received. It was held therein that the "taxable year" under section 116 (a) was determinable by the method of accounting employed rather than by the period in which the services were performed and that, since taxpayer employed the cash basis, the entire amount was includible in taxpayer's 1928 income. In the *Muhleman* case, *supra*, the taxpayer in this country received compensation in 1932 which he had earned in 1931, during which year he was a nonresident for more than six months. The court stated:

\* \* \* When a taxpayer reports on the cash basis, his cash receipts for the period covered by the return are to be taken into account no matter when the transactions or services which produced the income represented by the cash receipts may have been consummated or performed. \* \* \*

The taxpayer therefore, was bound, unless Sec. 116 (a) is applicable, to report this additional salary or bonus in the year during which he received it for

it was a part of his actual gross income for that period and for no other. The manner in which he elected to report his income did, indeed, determine the period for which it was reportable, and therefore taxable, but that is no anomaly. Whether a taxpayer reports on the cash or the accrual basis often changes the taxable year for which items of income are to be returned for taxation.

Since the taxable year for which the bonus was returnable for taxation was 1932 and there is neither claim nor proof that the taxpayer was a bona fide non-resident of this country for more than half of that period, it is clear that the statute relied on by the plaintiffs is not applicable.

See also *George W. P. Heffelfinger*, 5 T. C. 985.

Petitioner's 1941 return does not disclose the basis upon which it was made. There is no evidence upon what basis he made his 1936 and 1937 returns. He kept no books of account in 1940 and 1941. The records fail to disclose whether books were kept by him in 1936 and 1937. It is well established that where a taxpayer does not keep accounting records it may be assumed that the cash basis is used. *Court Holding Co.*, 2 T. C. 531, 536; *Mansuss Realty Co.*, 1 T. C. 932, 936; affd. (C. C. A., 2d Cir.), 143 Fed. (2d) 286.

Furthermore, section 107 is a part of Supplement A of Subchapter C, entitled "Rates of Tax," whereas section 116 is a part of Supplement B of Subchapter C, entitled "Computation of Net Income." Hence, section 107 (a) and section 116 (a) relate to different subject matters, i. e., a rate of taxation to be applied under certain conditions and the computation of net income under certain conditions. That section 107 (a) imposes a tax and does not purport to set up a rule for the determination or computation of taxable income is apparent from the language used, for it provides that the "tax" upon certain income for the taxable year "shall not be greater than the aggregate of the taxes attributable to such part [of such income] had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual." Had it been intended otherwise, Congress would no doubt have placed the section under Supplement B of Subchapter C, rather than under Supplement A of Subchapter C. Furthermore, section 107 (a) is also applicable to the "taxable year" and does not permit the recomputation of tax liability for years other than the taxable year. The recomputation of the tax for prior years is merely used as a measure of the tax to be imposed in the taxable year. Section 107 (a) does not provide that for all purposes or in general, the income shall be treated as received over the sixty-month (or more) period. Moreover, since section 107 (a) provides relief only when the income is received or accrued "in one taxable year," it is apparent that if, as petitioner wishes, the income here is in part considered constructively received [3] in 1936 and 1937, section 107 (a) becomes inapplicable.

---

[3] On brief petitioner argues, and repeats, that it is as though the amounts had "actually been received in those years."

It is therefore our opinion that section 116 (a) is not applicable, and that income received in 1941 for services rendered in 1936 and 1937 is not excludible from gross income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

OPPER, *J.*, did not participate in the consideration of or decision in this report.

ARUNDELL, *J* , dissents on the second point.