**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VAZKEN MOVSESIAN; HARRY
ARZOUMANIAN; GARO AYALTIN;
MIRAN KHAGERIAN; ARA
KHAJERIAN, individually and on
behalf of all others similarly
situated including thousands of
senior citizens, disabled persons,
and orphans as well as on behalf
of the general public and acting in
the public interest,
        *Plaintiffs-Appellees,*

     v.

VICTORIA VERSICHERUNG AG, a
German corporation; ERGO
VERSICHERUNGSGRUPPE AG, a
German corporation,
        *Defendants,*

     and

MUNCHENER RUCKVERSICHERUNGS-
GESELLSCHAFT AKTIENGESELLSCHAFT
AG, a German corporation,
        *Defendant-Appellant.*

No. 07-56722

D.C. No.
CV-03-09407-
CAS-JWJ

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
December 8, 2008—Pasadena, California

Filed December 10, 2010

19647

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Thompson

**COUNSEL**

Neil Michael Soltman, Los Angeles, California, for the defendant/appellant.

Brian S. Kabateck, Los Angeles, California, for the plaintiffs/appellees.

## ORDER

Judge Pregerson and Judge Nelson vote to grant the petition for rehearing and Judge Thompson votes to deny the petition for rehearing. The petition for rehearing is GRANTED.

The opinion and dissent filed on August 20, 2009, are hereby withdrawn. The opinion and dissent attached to this order are hereby filed.

New petitions for rehearing and rehearing en banc may be filed.

## OPINION

PREGERSON, Circuit Judge:

Section 354.4 of the California Code of Civil Procedure extends the statute of limitations until 2010 for claims arising out of life insurance policies issued to "Armenian Genocide victim[s]." Cal. Civ. Proc. Code § 354.4(c) (West 2006). The primary issue in this appeal is whether § 354.4 conflicts with a clear, express federal executive policy. We conclude that there is no express federal policy forbidding states to use the term "Armenian Genocide," and we affirm the district court.

## I.  Background

In 2000, the California Legislature enacted Senate Bill 1915, which amended California's Code of Civil Procedure[1]

---

[1]Hereinafter, all statutory references are to the California Code of Civil Procedure, unless otherwise indicated.

to provide California courts with jurisdiction over certain classes of claims arising out of insurance policies held by "Armenian Genocide vitcim[s]." Sen. Bill No. 1915 (1999-2000 Reg. Sess.), 2000 Cal. Legis. Serv. 543 (West 2000), codified at Cal. Civ. Proc. Code § 354.4. The Bill also amended the Code to extend the statute of limitations for such claims until December 31, 2010. *Id.* Section 354.4, in its entirety, provides:

> (a) The following definitions govern the construction of this section:
>
> (1) "Armenian Genocide victim" means any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period.
>
> (2) "Insurer" means an insurance provider doing business in the state, or whose contacts in the state satisfy the constitutional requirements for jurisdiction, that sold life, property, liability, health, annuities, dowry, educational, casualty, or any other insurance covering persons or property to persons in Europe or Asia at any time between 1875 and 1923.
>
> (b) Notwithstanding any other provision of law, any Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim, who resides in this state and has a claim arising out of an insurance policy or policies purchased or in effect in Europe or Asia between 1875 and 1923 from an insurer described in paragraph (2) of subdivision (a), may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution.

(c) Any action, including any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim, whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923 shall not be dismissed for failure to comply with the applicable statute of limitation, provided the action is filed on or before December 31, 2010.

(d) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

In the legislative findings accompanying the statute, the Legislature recognized that:

[D]uring the period from 1915 to 1923, many persons of Armenian ancestry residing in the historic Armenian homeland then situated in the Ottoman Empire were victims of massacre, torture, starvation, death marches, and exile. This period is known as the Armenian Genocide.

Sen. Bill No. 1915 at § 1.

In December 2003, Vazken Movsesian ("Movsesian") filed this class action against Victoria Versicherung AG ("Victoria"), Ergo Versicherungsgruppe AG ("Ergo"), and Munchener Ruckversicherungs-Gesellschaft Aktiengesellschaft AG ("Munich Re"). Movsesian and his fellow class members are persons of Armenian descent who claim benefits from insurance policies issued by Victoria and Ergo. Munich Re is the parent company of Victoria and Ergo. Movsesian seeks damages from all three companies for breach of written contract, breach of the covenant of good faith and fair dealing,

unjust enrichment, and other related claims. Munich Re filed a Rule 12(b)(6) motion to dismiss the claims, arguing that the class members lacked standing to bring claims under § 354.4, and contending that it was not a proper defendant under § 354.4. Munich Re also challenged the constitutionality of § 354.4, on the grounds that it violated the due process clause of the United States Constitution and was preempted under the foreign affairs doctrine.

The district court granted Munich Re's motion to dismiss the claims for unjust enrichment and constructive trust, and denied Munich Re's motion to dismiss the claims for breach of contract and breach of the covenant of fair dealing. The court held that the class members had standing to bring their claims, and that Munich Re was a proper defendant under § 354.4. The court rejected Munich Re's due process challenge, and held that § 354.4 was not preempted under the foreign affairs doctrine.

Munich Re filed a motion to certify the district court's order for interlocutory appeal, and to stay the action pending appeal. The district court granted the motion, and stayed the case. Within the ten-day window provided by 28 U.S.C. § 1292(b), Munich Re petitioned this court for permission to pursue an interlocutory appeal, which we granted.[2]

On appeal, the parties address three issues: first, whether § 354.4 is preempted under the foreign affairs doctrine; second, whether Munich Re is a proper defendant; and third,

---

[2]At oral argument, Munich Re asked us to take judicial notice of a December 4, 2008 letter from Nabi Sensoy, the Turkish Republic's Ambassador to the United States, to Molly Dwyer, Clerk of the United States Court of Appeals for the Ninth Circuit (December 4, 2008). We decline to take judicial notice of the letter because the letter was submitted after — and apparently in response to — the district court's decision. *See, e.g., Ctr. for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 455 F.3d 910, 918 n.3 (9th Cir. 2006) (declining to take judicial notice of documents issued after the district court's decision).

whether the Plaintiff-Appellees have standing to bring these claims.[3] We address each issue in turn.

## II.   Standard of Review

We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004). "When ruling on a motion to dismiss, we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## III.   The Constitutionality of § 354.4 Under the Foreign Affairs Doctrine

This case presents the issue of whether § 354.4 of the California Code of Civil Procedure is preempted under the foreign affairs doctrine. Munich Re contends that § 354.4 is preempted in two ways: first, that it conflicts with the Executive Branch's policy prohibiting legislative recognition of an "Armenian Genocide"; and second, that it is preempted by the Claims Agreement of 1922 (the "Claims Agreement") and the War Claims Act of 1928 (the "War Claims Act"). We conclude that there is no clear federal policy with respect to references to the Armenian Genocide, and, therefore, that there can be no conflict. We also conclude that neither the Claims Agreement nor the War Claims Act, which resolved World War I-related claims between the United States and Germany, has any application to life insurance policies issued to citizens of the Ottoman Empire between 1915 and 1923.

## A.   Conflict Preemption

**[1]** It is well settled that "at some point an exercise of state power that touches on foreign relations must yield to the

---

[3]Neither party addresses the due process issue on appeal.

National Government's policy." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003). "Nor is there any question generally that there is executive authority to decide what that policy should be." *Id.* at 414. However, not every executive action or pronouncement constitutes a proper invocation of that potentially preemptive policy-making power. *See Medellin v. Texas*, 552 U.S 491, 531-32 (2008) (limiting preemptive effect of informal presidential communications where Congress has not implicitly approved such authority). *Garamendi* established that executive agreements do carry policy-making force, at least where Congress has historically acquiesced to such executive practices. *See Garamendi*, 539 U.S. at 415; *Medellin*, 552 U.S 491 at 531-32. In *Garamendi*, the Court found that several executive agreements, coupled with statements from executive branch officials, constituted an express federal policy. *Garamendi*, 539 U.S. at 415. Here, in contrast, there is no executive agreement regarding use of the term "Armenian Genocide."

Instead, Munich Re points to informal presidential communications as the sole source of a clear, express federal policy against use of the term "Armenian Genocide." For example, in 2000, House Resolution 596 proposed to recognize the Ottoman Empire's atrocities against the Armenians between 1915 and 1923. H. R. Res. 596, 106th Cong. (2000). President Clinton and senior administration officials sent letters to the House, suggesting that Resolution 596 would negatively impact United States interests in the Balkans and Middle East. Letter to the Speaker of the House of Representatives on a Resolution on Armenian Genocide, 3 Pub. Papers 2225-26 (Oct. 19, 2000); H.R. Rep. No. 106-933, at 16-19 (2000). Resolution 596 was never brought to a floor vote.

In 2003, a proposed general resolution "reaffirm[ed] support of the Convention on the Prevention and Punishment of the Crime of Genocide" and used the term "Armenian Genocide." H.R. Res. 193, 108th Cong. (2003). A State Department official opposed the resolution, arguing that it would

hamper peace efforts in the Caucasus. H.R. Rep. No. 108-130, at 5-6 (2003). The resolution never reached the House floor.

In 2007, the House entertained another resolution that would provide official recognition to an "Armenian Genocide." House Resolution 106 was nearly indistinguishable from House Resolution 596, discussed above. President Bush opposed Resolution 106, to which he referred as the "Armenian genocide resolution," on the ground that it would negatively affect the war on terror. Remarks on Intelligence Reform Legislation, 43 Weekly Comp. Pres. Doc. 1320 (Oct.10, 2007). The House never brought Resolution 106 to the floor for a vote.

**[2]** Munich Re argues that these communications are sufficient to constitute an express federal policy. They are not. The three cited executive branch communications arguing against recognition of the Armenian Genocide are counterbalanced, if not outweighed, by various statements from the federal executive and legislative branches *in favor* of such recognition.

Despite its occasional reluctance to officially recognize the Armenian Genocide, the House of Representatives has done so in the past. In 1975, the House observed a day of remembrance for "all victims of genocide, especially those of Armenian ancestry." H.J. Res. 148, 94th Congress (1975). In 1984, the House similarly recognized "victims of genocide, especially the one and one-half million people of Armenian ancestry." H.J. Res. 247, 98th Congress (1984).

The Executive Branch has repeatedly used terms virtually indistinguishable from "Armenian Genocide." In 1998, President Clinton publicly commemorated "the deportations and massacres of a million and a half Armenians in the Ottoman Empire in the years 1915-1923." 1 Pub. Papers 617 (Apr. 24, 1998). In 1981, President Reagan explicitly stated that "like the *genocide of the Armenians* before it, and the genocide of the Cambodians, which followed it —and like too many other

persecutions of too many other people— the lessons of the Holocaust must never be forgotten." Proclamation 4838 (Apr. 22, 1981) *available at* http://www.reagan.utexas.edu/archives/ speeches/1981/42281c.htm (emphasis added).

The current administration has also at times favored recognition of the Armenian Genocide. In the midst of his campaign for the presidency, then-Senator Obama asserted in a Senate floor statement that "[i]t is imperative that we recognize the horrific acts carried out against the Armenian people as genocide." *See, e.g.,* 110th Cong . Rec. S3438-01 (Apr. 28, 2008). Since taking office, President Obama has issued additional statements that seem to support recognition of the Armenian Genocide. In 2009, for example, President Obama publicly remembered "the 1.5 million Armenians who were [ ] massacred or marched to their death in the final days of the Ottoman Empire. The Meds Yeghern must live on in our memories, just as it lives on in the hearts of the Armenian people." *See* Statement of President Barack Obama on Armenian Remembrance Day, http://www.whitehouse.gov/ the_press_office/Statement-of-President-Barack-Obama-on-Armenian-Remembrance-Day/ (last accessed August 13, 2010). "Meds Yeghern" is the term for "Armenian Genocide" in the Armenian language.

[3] We also note that while some forty states recognize the Armenian Genocide, the federal government has never expressed any opposition to any such recognition. *See, e.g.*, Mich. Comp. Laws § 435.281 ("Michigan Days of Remembrance of Armenian Genocide"); 1990 Okla. Sess. Law Serv. Sen. Conc. Res. 68 (West) ("Armenian Remembrance Day"); Proclamation of Governor Jim Gibbons Declaring April 24, 2010 as "Armenian Genocide Remembrance Day", http://gov.state.nv.us/PROCs/2010/2010-04-24_Armenian_ genocide_remembrance.pdf (last visited August 13, 2010); Proclamation of Governor John Hoeven Declaring April 24, 2007 "Armenian Genocide Remembrance Day",

http://governor.nd.gov/proc/docs/2007/04/20070424a.pdf (last visited August 20, 2010).

**[4]** Considering the number of expressions of federal executive and legislative support for recognition of the Armenian Genocide, and federal inaction in the face of explicit state support for such recognition, we cannot conclude that a clear, express federal policy forbids the state of California from using the term "Armenian Genocide."

**[5]** The Supreme Court has suggested that field and conflict preemption are "complementary," *Garamendi*, 539 U.S. at 420 n.11, and that it "would be reasonable" to consider the strength of a state's interest to determine "how serious a conflict must be shown before declaring the state law preempted." *Id.* at 420. Having determined that there is no clear federal policy with which § 354.4 could conflict, we briefly discuss the possibility of field preemption. Under the Court's suggested approach, field preemption would only apply if a "State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility." *Id.* at 420 n.11. That is not the case here.

**[6]** California's attempt to regulate insurance clearly falls within the realm of traditional state interests. The legislative findings accompanying California Code of Civil Procedure § 354.4 recognize that thousands of California residents and citizens have often been deprived of their entitlement to benefits under certain insurance policies. S. 1915, 1999-2000 Reg. Sess. (Cal. 2000) at § 1(b). The Supreme Court has recognized that California has "broad authority to regulate the insurance industry." *Garamendi*, 539 U.S. at 434 n.1 (Ginsburg, J. dissenting) (citing *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 653-655 (1981)). California has not exceeded that authority merely by "assigning special significance to an insurer's treatment arising out of a[ ] [particular] era . . . ." *Id.* California's interest in ensuring that its citizens are fairly treated by insurance

companies over which the State exercises jurisdiction is hardly a superficial one. Furthermore, Section 354.4's regulation of the insurance industry has, at most, an incidental effect on foreign affairs, particularly considering that thirty-nine other states already officially recognize the Armenian Genocide. *See Garamendi*, 539 U.S. at 418-42.

## B.   Preemption By the Claims Agreement and the War Claims Act

**[7]** In 1922, the United States and Germany entered into an executive agreement establishing a commission to resolve all claims concerning "debts owing to American citizens by the German government or by German nationals." 42 Stat. 2200 (1922) (the "Claims Agreement"). In 1928, the Settlement of War Claims Act (the "War Claims Act") provided for payment of Claims Agreement awards. *Z & F Assets Realization Corp. v. Hull*, 114 F.2d 464, 476 (D.C. Cir. 1940), *aff'd*, 311 U.S. 470 (1941). The Claims Agreement and War Claims Act, if applicable, have preemptive effect. *See Garamendi*, 539 U.S. at 416; *Medellin*, 552 U.S. at 532.

**[8]** Munich Re argues that the Claims Agreement and War Claims Act apply to claims against German insurance companies by Armenian Genocide victims. We disagree. The insurance policies were the private property of insured Armenian citizens of the Ottoman Empire, not German debts owing to American citizens.

Munich Re's reliance on *Deutsch v. Turner*, 324 F.3d 692 (9th Cir. 2003), is misplaced. In *Deutsch*, we invalidated a California statute that allowed World War II slave laborers to bring war-related claims against wartime enemies of the United States. *Deutsch*, 324 F.3d at 712. We held that California's attempt to create a private right of action for war-related injuries intruded upon the federal government's exclusive power over matters related to war. *Id.* at 712-716.

Here, in contrast, § 354.4 does not implicate the government's exclusive power over war. Section 354.4 covers private insurance claims, not wartime injuries. *See Alperin v. Vatican Bank*, 410 F.3d 532, 548 (9th Cir. 2005) (distinguishing "garden-variety" private property interests from war injuries). Furthermore, as the district court noted, the Claims Agreement was signed *before* the end of the Armenian Genocide. According to the California legislature, the Armenian Genocide ended in 1923, a year after the Claim Act was signed at Berlin. We reject Munich Re's assertion that the Claims Agreement, which resolved claims from the concluded fighting in World War I, has any bearing on life insurance policies issued to citizens of the Ottoman Empire. The Claims Agreement and War Claims act therefore do not preempt § 354.4.

## IV. Whether Munich Re Is a Proper Defendant

**[9]** Munich Re also argues that is it not an "insurer," as defined in § 354.4(a)(2), and therefore is not a proper defendant. Specifically, Munich Re contends that it did not issue insurance policies in Europe or Asia at any time between 1875 and 1923. However, Munich Re's subsidiaries, Victoria and Ergo, *did* issue such policies. Contrary to Munich Re's interpretation, § 354.4 does not define "insurer" for purposes of limiting the class of potential *defendants*, but rather to limit the types of *claims* that may be brought. Cal. Civ. Proc. Code § 354.4(b). Accordingly, Munich Re is a proper defendant.

## V. Whether Movsesian Has Standing

**[10]** Lastly, we agree with the district court that § 354.4(c) confers standing on Movsesian. We reject Munich Re's assertion that § 354.4(c)'s reference to Armenian genocide victims, their heirs, and beneficiaries is "all-encompassing." The broad language of § 354.4(c) clearly applies to "any action" seeking benefits under the insurance policies, so long as the action is filed before December 31, 2010.

## VI.  Conclusion

California Code of Civil Procedure § 354.4 is not pre-empted by federal law. There is no clearly established, express federal policy forbidding state references to the Armenian Genocide. California's effort to regulate the insurance industry is well within the realm of its traditional interests. Nothing in § 354.4(a)(2) or § 354.4(b) operates to limit the class of proper defendants, nor does § 354.4(c) limit standing to any particular group. Accordingly, the district court's order denying the Rule 12(b)(6) motion to dismiss is AFFIRMED.

---

THOMPSON, Senior Circuit Judge, dissenting:

Contrary to the majority's view, I would hold that a clear Presidential foreign policy exists in this case against officially recognizing the "Armenian Genocide." Over the past decade, three separate House Resolutions have attempted to formally recognize the "Armenian Genocide." *See* H.R. Res. 596, 106th Cong. (2000); H.R. Res. 193, 108th Cong. (2003); H.R. Res. 106, 110th Cong. (2007). Each time, however, the Administrations of President Clinton and President Bush took specific actions, both publicly and privately, to oppose those Resolutions[1] and to urge that legislative action was not the

---

[1] *See, e.g.*, Letter to the Speaker of the House of Representatives on a Resolution on Armenian Genocide, 3 Pub. Papers 2225-26 (Oct. 19, 2000) (noting that H.R. Res. 596 could have "far-reaching negative consequences for the United States" and might "undermine efforts to encourage improved relations between Armenia and Turkey"); H.R. Rep. No. 108-130, at 5-6 (2003) (noting that H.R. Res. 193 "could complicate our efforts to bring peace and stability to the Caucasus and hamper ongoing attempts to bring about Turkish-Armenian reconciliation"); Press Release, White House Office of the Press Secretary, President Bush Discusses Foreign Intelligence Surveillance Act Legislation (Oct. 10, 2007) (noting that H.R. Res. 106 "would do great harm to our relations with a key ally in NATO and in the global war on terror").

preferred solution.[2] And each time, as a result, the Resolutions concerned were never brought to a vote on the floor.

Based on this undisputed evidence, which in my view is not undermined by the federal government's occasional efforts to commemorate these tragic and horrific events, I would conclude that there is an express foreign policy prohibiting legislative recognition of the "Armenian Genocide," as pronounced by the Executive Branch and as acquiesced in by Congress. Accordingly, I dissent. I would find that California Code of Civil Procedure § 354.4 is preempted because it clearly conflicts with this express federal policy. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420-25 (2003).

More importantly, the same result is mandated under a theory of field preemption. The Supreme Court has characterized the power to deal with foreign affairs as primarily, if not exclusively, vested in the federal government. *See, e.g.*, *id.* at 413-14; *Zschernig v. Miller*, 389 U.S. 429, 435-36 (1968); *United States v. Pink*, 315 U.S. 203, 233 (1942). As a result, the Court has declared state laws to be preempted when they were incompatible with the federal government's foreign affairs power, even in the absence of any conflict. *See, e.g.*, *Zschernig*, 389 U.S. at 432, 440-41 (striking down an Oregon probate law, in the absence of any federal action, because it was an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress"); *Hines v. Davidowitz*, 312 U.S. 52, 62-65 (1941) (invalidating a Pennsylvania statute governing aliens because the field of immigration regulation is occupied exclusively by

---

[2]*See, e.g.*, Press Release, White House Office of the Press Secretary, President Bush Discusses Foreign Intelligence Surveillance Act Legislation (Oct. 10, 2007) (urging opposition to H.R. Res. 106 because it was "not the right response to these historic mass killings"); Press Release, White House Office of the Press Secretary, Press Briefing by Dana Perino (Oct. 11, 2007) ("The President believes that the proper way to address this issue and express our feelings about it is through the presidential message and not through legislation.").

federal law). This court has done the same on occasion, also in the absence of any apparent conflict. *See, e.g.*, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 965-68 (9th Cir. 2010) (finding preempted California's statute dealing with recovery of art stolen by the Nazis because the statute intruded on the federal government's power to make and resolve war); *Deutsch v. Turner Corp.*, 324 F.3d 692, 715-16 (9th Cir. 2003) (finding unconstitutional California's statute providing recovery to World War II slave laborers because the statute intruded on the federal government's power to resolve war claims).

The central question under a field preemption analysis is whether, in enacting § 354.4, California has addressed a "traditional state responsibility," *Garamendi*, 539 U.S. at 419 n.11, or whether it has "infringed on a foreign affairs power reserved by the Constitution exclusively to the national government." *Von Saher*, 592 F.3d at 964. Courts have consistently looked past "superficial" interests to ascertain true legislative intent. *See, e.g.*, *Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws); *Zschernig*, 389 U.S. at 437-41 *(rejecting purported state interest in regulating descent of property); Von Saher*, 592 F.3d at 964-65 (rejecting purported state interest in establishing a statute of limitations for actions seeking the return of stolen property); *Deutsch*, 324 F.3d at 707-08 (rejecting purported state interest in procedural rules).

In this case, even though § 354.4 purports to regulate the insurance industry, its real purpose is to provide relief to the victims of "Armenian Genocide." *See* Sen. Jud. Comm., Analysis of S.B. 1915, 1999-2000 Reg. Sess. 5-6 (May 9, 2000). By its terms, only "Armenian Genocide" victims or their heirs and beneficiaries can bring a claim under the statute. CAL. CIV. PROC. CODE § 354.4(b). "Armenian Genocide victim," in turn, is defined as "any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or

escaped to avoid persecution during that period." *Id.* § 354.4(a). In short, § 354.4 is California's attempt to provide relief to a specific category of claimants who were aggrieved by a foreign nation, not a general attempt to regulate the insurance industry. While this may be a commendable goal, it is not an area of "traditional state responsibility," and the statute is therefore subject to a field preemption analysis. *See Garamendi*, 539 U.S. at 419 n.11, 425-27; *Von Saher*, 592 F.3d at 964-65.

The majority errs in relying on Justice Ginsburg's dissent in *Garamendi* to reach a contrary conclusion. *See ante* at 19659. The *Garamendi* majority specifically *rejected* Justice Ginsburg's position that California in that case had broad authority to regulate the insurance industry, noting instead that the challenged statute "effectively single[d] out only policies issued by European companies, in Europe, to European residents, at least 55 years ago." 539 U.S. at 425-26. Similarly, in this case, California's interest is weak because instead of regulating the insurance industry generally, § 354.4 effectively singles out only policies issued in Europe or Asia, to any person of Armenian ancestry, in the Ottoman Empire, at least 87 years ago.

As applied to this case, there can be no doubt that § 354.4 is preempted. The Constitution vests with the President the power to make policy determinations regarding national security, wars in progress, and diplomatic relations with foreign nations. *See* U.S. Const. art. II, § 2, cl. 1; *id.* § 2, cl. 2; *id.* § 3; *see also Garamendi*, 539 U.S. at 414-15; *Deutsch*, 324 F.3d at 708-09. The Constitution also delegates to the President the prerogative "to speak for the Nation with one voice in dealing with other governments." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). When it comes to interactions with foreign nations, "state lines disappear." *United States v. Belmont*, 301 U.S. 324, 331 (1937). By declaring that the "Armenian Genocide" has occurred and by providing a right of action for its victims, California is intrud-

ing into the field of foreign relations by passing judgment on another nation when the President has expressly decided to pursue an alternate way of addressing the issue.[3] California's approach, thus, "undercuts the President's diplomatic discretion and the choice he has made exercising it." *See Garamendi*, 539 U.S. at 423-24.

Finally, the majority's opinion appears to be in conflict with our recent case law on the issue. The majority highlights the fact that in this case there is no executive agreement regarding the use of the term "Armenian Genocide." See ante at 19656. However, our recent decisions in *Deutsch* and *Von Saher* indicate that the preemptive power of federal policy is not derived from the form of the policy statement, but rather from the source of the Executive Branch's authority to act. Thus, we have recently stated that "foreign affairs field preemption may occur 'even in the absence of a treaty or federal statute, because a state may violate the Constitution by establishing its own foreign policy.' " *Von Saher*, 592 F.3d at 964 (quoting *Deutsch*, 324 F.3d at 709). Applying this principle, the court can hold a state law preempted regardless of "whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government." *See Garamendi*, 539 U.S. at 419 n.11; *accord Von Saher*, 592 F.3d at 963-64.

Accordingly, I would conclude there is an express Presidential foreign policy, as acquiesced in by Congress, prohibit-

---

[3]The President's concern that a formal recognition of the "Armenian Genocide" might have negative consequences on our relations with Turkey is very real. For example, when the French National Assembly voted in favor of a bill that would criminalize denial of the events of 1915, the Turkish military cut all contacts with the French military and terminated defense contracts under negotiation. *See* Letter from Robert M. Gates, Sec'y of Defense, and Condoleeza Rice, Sec'y of State, to Nancy M. Pelosi, Speaker of the House of Representatives (Mar. 7, 2001).

ing legislative recognition of the "Armenian Genocide." By formally recognizing the "Armenian Genocide," § 354.4 directly conflicts with this foreign policy. Moreover, far from concerning an area of traditional state interest, § 354.4 instead infringes upon the federal government's prerogative to conduct foreign affairs. Therefore, I respectfully dissent and would reverse the district court's order denying the Rule 12(b)(6) motion to dismiss.