WARRICK et ux. v. COMMISSIONER OF
INTERNAL REVENUE.

No. 13873.

United States Court of Appeals
Eighth Circuit.

April 21, 1949.

Albert F. Hillix and Dupuy G. Warrick, both of Kansas City, Mo. (John E. Park and Gage, Hillix & Phelps, all of Kansas City, Mo., on the brief), for petitioners.

Carlton Fox, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack and S. Walter Shine, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

GARDNER, Chief Judge.

This matter is before us on petition for review of a decision of the Tax Court assessing a deficiency in the taxpayers' income for the year 1940. The basis for the deficiency is the inclusion of an attorney fee of $125,000 paid to petitioner Dupuy G. Warrick in a lump sum on December 23, 1940. Petitioners are husband and wife and filed a joint income tax return. The income involved was that of Mr. Warrick and we shall refer to him as taxpayer or Warrick.

The question involved is whether in computing taxpayers' income for that year, petitioners are entitled to the benefit of Section 107 of the Internal Revenue Code, 26 U.S.C.A. § 107, with respect to the attorney fee of $125,000 received by taxpayer for legal services rendered by him under a contract of employment entered into in Janu-

ary, 1932. The Tax Court concluded that this fee was paid for services rendered during a period of less than five calendar years and hence could not be prorated in accordance with Section 107 of the Internal Revenue Code. The facts are not in dispute although they are somewhat complicated. Omitting many details not deemed necessary for an understanding of the issues presented, these facts may be stated as follows:

In January, 1932, taxpayer, who is a lawyer, was employed by Frank P. Parish, president of Missouri-Kansas Pipe Line Company, to assist him and a certain group of stockholders and creditors of the company in the prosecution of certain claims against Columbia Gas & Electric Corporation and its subsidiary, Columbia Oil & Gasoline Corporation, for violation of the anti-trust laws. It was agreed that he should be compensated for his services from the fund, if any, recovered as a result of the assertion of these claims. The Missouri-Kansas Pipe Line Company was a holding company, its principal assets consisting of various stocks, bonds and unsecured claims. The Panhandle Corporation, a wholly owned subsidiary of the Missouri-Kansas Pipe Line Company, owned certain notes and one-half of the outstanding capital stock of Panhandle Eastern Pipe Line Company. The Columbia Gas & Electric Corporation and the Columbia Oil & Gasoline Corporation owned the other one-half of Panhandle Eastern's stock. The Missouri-Kansas Pipe Line Company's indirect ownership of Panhandle Eastern represented a $13,000,000 or $14,000,000 investment. Differences had arisen between the Columbia companies and the Missouri-Kansas Pipe Line Company over the policy to be pursued by the management of Panhandle Eastern, which was under control of the Columbia companies. As a result the bonds and notes of Panhandle Eastern were in default and because of these complications, in March, 1932, Missouri-Kansas Pipe Line Company was placed in receivership in a proceeding in the Court of Chancery for Newcastle County, State of Delaware. The taxpayer continued to represent Parish and the same group of stockholders in connection with the claims against the Columbia companies and after prolonged work, negotiations and litigation a settlement of these claims was brought about by the taxpayer and approved by the Chancery Court of Delaware in April, 1936. As a result of the settlement the receivership estate ultimately received assets having a value of $12,000,000 and the stockholders of the Missouri-Kansas Pipe Line Company received stock rights of a value of approximately $2,000,000. One of the terms of the settlement brought about by taxpayer was that Panhandle Eastern Pipe Line Company would issue 160,000 additional shares of common stock, one-half of which the receivers were to distribute to the common and Class B stockholders of the Missouri-Kansas Pipe Line Company. The warrants evidencing the right to subscribe to these 80,000 shares of stock represented a valuable asset to the stockholders of Missouri-Kansas Pipe Line Company because they authorized purchase of this stock at $25 per share, whereas the market value of the stock was $50 to $60 per share. Among stockholders entitled to receive the warrants were taxpayer's clients.

The provisions of the settlement relating to the issuance of these warrants were not immediately complied with and it became necessary for taxpayer to continue his services to compel a compliance with the terms of the settlement. Following the settlement several attempts were made by interests hostile to taxpayer's clients to have the terms of the settlement modified. Thus, during 1937 one McGuire brought suit to modify the terms of the settlement so as to permit Missouri-Kansas Pipe Line Company to distribute the stock rights instead of having them distributed from the receivers to the stockholders. Taxpayer appeared in court and successfully opposed this modification, but later, on ex parte order, the warrants were turned over to the company and its new officers instead of to the stockholders, and in June, 1938, taxpayer, representing his clients, succeeded in getting this ex parte order set aside and the original order relative to the distribution by the receivers restored. This litigation occurred in 1938 and 1939. Thereafter taxpayer performed services in connection with the same matter by assisting in the

preparation of a plan for distribution of the warrants which in fact were finally distributed to the stockholders in September or October, 1939, so that the terms of the settlement, although approved by the court in 1936, were in fact not completely carried out until September or October of 1939. On December 18, 1936, the Court of Chancery determined the amount of compensation to be allowed taxpayer, fixing it at $125,000, plus expenses. Between that date and December, 1940, the receiver of the Missouri-Kansas Pipe Line Company withheld payment and the Chancery Court issued an order to show cause why it had not been paid. The matter was carried to the Supreme Court of Delaware and on April 1, 1940, that court affirmed the allowance and ordered the receivers to make payment and the payment was actually made December 23, 1940. This $125,000 received by taxpayer in 1940 was the only compensation received by him for the services rendered to his clients under his employment in January, 1932.

The statute involved reads as follows: "Sec. 107. Compensation for services rendered for a period of five years or more. In the case of compensation (a) received, for personal services rendered by an individual in his individual capacity, or as a member of a partnership, and covering a period of five calendar years or more from the beginning to the completion of such services, (b) paid (or not less than 95 per centum of which is paid) only on completion of such services, and (c) required to be included in gross income of such individual for any taxable year beginning after December 31, 1938, the tax attributable to such compensation shall not be greater than the aggregate of the taxes attributable to such compensation had it been received in equal portions in each of the years included in such period."

In the final analysis the ultimate fact to be determined from the evidence is when Warrick's services rendered under his contract were completed. It is the contention of respondent that the services should be divided into two portions, that rendered up to the time of the settlement, and that rendered subsequent to the settlement. There was but one contract of employment and all services were rendered pursuant to that contract. Warrick had secured a very valuable settlement which, through his efforts, was approved by the court. This approval, however, did not terminate the litigation and as a reputable attorney Warrick, to protect the interests of his clients, continued his efforts so as to make the order which he had obtained effectual. The relation of attorney and client continued during all the proceedings and steps taken for the purpose of enforcing the order which he had secured. The determination of the original controversy did not terminate the relation of attorney and client because the purpose and object of his employment had not, as appears from the record, been completely accomplished. Union Bank v. Geary, 5 Pet. 99, 8 L.Ed. 60; Arthaud v. McFerrin, Mo.Sup., 156 S.W.2d 641; Todd v. Rhodes, 108 Kan. 64, 193 P. 894; Ohlquist v. Nordstrom, 262 N.Y. 696, 188 N.E. 125. Warrick was not representing defendants, but plaintiffs seeking affirmative relief. He could not ethically have abandoned his clients' interests even though his compensation had been allowed. Canon 44 of Professional Ethics adopted by the American Bar Association provides in part as follows: "The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of the client is not always sufficient. The lawyer should not throw up the unfinished task to the detriment of his client except for reasons of honor or self-respect. * * *"

As said by this court in Brown v. Arnold, 8 Cir., 131 F. 723, 725, "* * * while the general rule is said to be that the authority derived by an attorney at law from a general retainer to conduct a litigation on behalf of his client ceases when the judgment is rendered, there are many exceptions to this rule, and in the actual practice of the law it is at least doubtful whether it is not more honored in the breach than in the observance. Among the acknowledged exceptions to it are the authority of the attorney for the party who prevails in the judgment to collect it, his authority to receipt for its proceeds and to discharge it,

his authority to admit service of a citation issued upon a writ of error or appeal to review it, *and his authority to oppose any steps that may be taken within a reasonable time by the defeated party to reverse it."* (Italics supplied.)

Warrick's contract of employment was on a contingent basis and required him to perform all necessary work to carry the case through, whether contemplated at the time of his employment or not, and this required him to use his best efforts to see that the settlement was carried out. Although Warrick received no additional compensation for the services rendered after the time it was fixed by the court, the compensation so fixed as a matter of law covered the entire services which he as a practicing lawyer was required to render. His clients, had he refused to render the services subsequent to 1936 for the purpose of enforcing the terms of the settlement, might not have received the warrants of the value of approximately $2,000,000, distributable to them. These services rendered subsequent to 1936 also increased the fund in the hands of the receivers. Although the rights to subscribe for the issued stock were ultimately to be placed in the hands of stockholders, this fact does not negative a benefit to the receivership estate, and hence, the services rendered in connection with these rights were rendered in preservation of the estate. The record shows that there was threat not to issue the stock because no plan of distribution had been prepared. In 1937, an ex parte order had been obtained, diverting the warrants from the common fund and from the hands of the receivers because these rights had not been issued to the receivers. Warrick's activities in causing this order to be set aside brought these rights into the funds under the court's jurisdiction where they were available for payment or such distribution as the court might order. The final plan of distribution which Warrick prepared increased the realization of the estate from these rights to the maximum amount by providing that the rights should be distributed to the stockholders of Missouri-Kansas Pipe Line Company to the extent that they could be located, but prevented the forfeiture by expiration of the option date of these warrants so set aside for stockholders who could not be located or who did not supply adequate proof. It provided that these unclaimed warrants were to be transferred to Missouri-Kansas Pipe Line Company, so that this service of Warrick actually increased the fund in the receivership estate. Certainly, in performing services for the stockholders whom Warrick represented, subsequent to 1936, he was working in the interest of the receivership to the same extent as he had worked prior to December, 1936. As said by the Supreme Court in Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157, "* * * where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."

Warrick testified: "The distribution of these rights directly to stockholders of Missouri-Kansas was an integral part of the settlement agreement, and accordingly an important part of the work I was employed to do, and for which this fee was allowed me."

He also testified that at a hearing in connection with the distribution of the warrants in June, 1938, the Chancellor said: "I want it understood by all interested parties in respect to this settlement, the allowances heretofore stand and that covers the complete job until you are through."

This was a construction by the Chancellor of the order allowing and fixing Warrick's attorney fee. Attorney fees are not susceptible of exact computation, nor are the services for which compensation is paid or awarded capable of being exactly defined. The attorney is at all times an officer of the court and must demean himself toward his client with unquestioned fidelity and must consistently represent his interests and protect his rights. Not only must he do nothing against the best interests of his client but the trust and confidential relation existing between him and his client require that he do everything consistent

with proper professional conduct within his power in his client's interest.

■ There was evidence that Warrick had acquired some stock in Missouri-Kansas Pipe Line Company after the settlement was approved and before the later services were performed. This fact was apparently considered as important by the Tax Court. Counsel for respondent, however, now concede that this fact is wholly immaterial to the issues. Eliminating this factor from consideration it seems to us that the case of Stallforth v. Commissioner, 6 T.C. 140, is persuasive. In that case the Tax Court considered the applicability of Section 107 of the Internal Revenue Code to compensation received by a taxpayer for personal services rendered in connection with negotiations for settlement of claims arising out of the Black Tom disaster in 1916. Awards were entered on June 15, 1939. In October, 1939, the awards were certified by the Secretary of State to the Secretary of the Treasury for payment. On the same date an action was instituted to enjoin the payments. After the determination of this action the awards were paid in 1941. Taxpayer in that case was employed in 1935. He carried on activities in connection with the negotiations both before and after the awards were made. The Tax Court held that the services were performed from the date of employment through 1940, approximately one year after the award was entered. In the Stallforth case the services performed after the awards were unsuccessful, while in the present case they were successful. The Tax Court held in that case that the services performed after the award were to be considered in computing the length of time for the purposes of Section 107 of the Code.

We are of the view that the personal services for which Warrick was compensated covered a period of more than five years from the beginning to the completion of such services and that petitioners were therefore entitled to the benefit of Section 107 of the Internal Revenue Code with respect to the fee of $125,000 received by Warrick for such services. The decision of the Tax Court is therefore reversed and the cause remanded for appropriate action in conformity with this opinion.